CONTINENTAL T. V., INC., ET AL. *v.*
GTE SYLVANIA INC.

No. 76–15.   Argued February 28, 1977—Decided June 23, 1977

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and STEVENS, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 59. BRENNAN, J., filed a dissenting statement, in which MARSHALL, J., joined, *post*, p. 71. REHN-QUIST, J., took no part in the consideration or decision of the case.

*Glenn E. Miller* argued the cause for petitioners. With him on the briefs were *Lawrence A. Sullivan* and *Jesse Choper*.

*M. Laurence Popofsky* argued the cause for respondent. With him on the brief were *Richard L. Goff* and *Stephen V. Bomse.*\*

MR. JUSTICE POWELL delivered the opinion of the Court.

Franchise agreements between manufacturers and retailers frequently include provisions barring the retailers from selling franchised products from locations other than those specified in the agreements. This case presents important questions concerning the appropriate antitrust analysis of these restrictions under § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, and the Court's decision in *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967).

---

\*Briefs of *amici curiae* urging affirmance were filed by *Lawrence T. Zimmerman* for the Associated Equipment Distributors; by *Lloyd N. Cutler, James S. Campbell, William T. Lake,* and *Donald F. Turner* for the Motor Vehicle Manufacturers Assn.; and by *Philip F. Zeidman* and *John A. Dienelt* for the International Franchise Assn.

## I

Respondent GTE Sylvania Inc. (Sylvania) manufactures and sells television sets through its Home Entertainment Products Division. Prior to 1962, like most other television manufacturers, Sylvania sold its televisions to independent or company-owned distributors who in turn resold to a large and diverse group of retailers. Prompted by a decline in its market share to a relatively insignificant 1% to 2% of national television sales,[1] Sylvania conducted an intensive reassessment of its marketing strategy, and in 1962 adopted the franchise plan challenged here. Sylvania phased out its wholesale distributors and began to sell its televisions directly to a smaller and more select group of franchised retailers. An acknowledged purpose of the change was to decrease the number of competing Sylvania retailers in the hope of attracting the more aggressive and competent retailers thought necessary to the improvement of the company's market position.[2] To this end, Sylvania limited the number of franchises granted for any given area and required each franchisee to sell his Sylvania products only from the location or locations at which he was franchised.[3] A franchise did not constitute an exclusive territory, and Sylvania retained sole discretion to increase the number of retailers in an area in light of the success or failure of existing retailers in developing their market. The revised marketing strategy appears to have been successful during the period at issue here, for by 1965 Sylvania's share of national television sales had increased to approximately 5%, and the

[1] RCA at that time was the dominant firm with as much as 60% to 70% of national television sales in an industry with more than 100 manufacturers.

[2] The number of retailers selling Sylvania products declined significantly as a result of the change, but in 1965 there were at least two franchised Sylvania retailers in each metropolitan center of more than 100,000 population.

[3] Sylvania imposed no restrictions on the right of the franchisee to sell the products of competing manufacturers.

company ranked as the Nation's eighth largest manufacturer of color television sets.

This suit is the result of the rupture of a franchiser-franchisee relationship that had previously prospered under the revised Sylvania plan. Dissatisfied with its sales in the city of San Francisco,[4] Sylvania decided in the spring of 1965 to franchise Young Brothers, an established San Francisco retailer of televisions, as an additional San Francisco retailer. The proposed location of the new franchise was approximately a mile from a retail outlet operated by petitioner Continental T. V., Inc. (Continental), one of the most successful Sylvania franchisees.[5] Continental protested that the location of the new franchise violated Sylvania's marketing policy, but Sylvania persisted in its plans. Continental then canceled a large Sylvania order and placed a large order with Phillips, one of Sylvania's competitors.

During this same period, Continental expressed a desire to open a store in Sacramento, Cal., a desire Sylvania attributed at least in part to Continental's displeasure over the Young Brothers decision. Sylvania believed that the Sacramento market was adequately served by the existing Sylvania retailers and denied the request.[6] In the face of this denial, Continental advised Sylvania in early September 1965, that it was in the process of moving Sylvania merchandise from its San Jose, Cal., warehouse to a new retail location that it had leased in Sacramento. Two weeks later, allegedly for unrelated reasons, Sylvania's credit department reduced Conti-

---

[4] Sylvania's market share in San Francisco was approximately 2.5%—half its national and northern California average.

[5] There are in fact four corporate petitioners: Continental T. V., Inc., A & G Sales, Sylpac, Inc., and S. A. M. Industries, Inc. All are owned in large part by the same individual, and all conducted business under the trade style of "Continental T. V." We adopt the convention used by the court below of referring to petitioners collectively as "Continental."

[6] Sylvania had achieved exceptional results in Sacramento, where its market share exceeded 15% in 1965.

nental's credit line from $300,000 to $50,000.[7] In response to the reduction in credit and the generally deteriorating relations with Sylvania, Continental withheld all payments owed to John P. Maguire & Co., Inc. (Maguire), the finance company that handled the credit arrangements between Sylvania and its retailers. Shortly thereafter, Sylvania terminated Continental's franchises, and Maguire filed this diversity action in the United States District Court for the Northern District of California seeking recovery of money owed and of secured merchandise held by Continental.

The antitrust issues before us originated in cross-claims brought by Continental against Sylvania and Maguire. Most important for our purposes was the claim that Sylvania had violated § 1 of the Sherman Act by entering into and enforcing franchise agreements that prohibited the sale of Sylvania products other than from specified locations.[8] At the close of evidence in the jury trial of Continental's claims, Sylvania requested the District Court to instruct the jury that its location restriction was illegal only if it unreasonably restrained or suppressed competition. App. 5–6, 9–15. Relying on this Court's decision in *United States* v. *Arnold, Schwinn & Co., supra,* the District Court rejected the proffered instruction in favor of the following one:

"Therefore, if you find by a preponderance of the evidence that Sylvania entered into a contract, combination or conspiracy with one or more of its dealers pursuant to which Sylvania exercised dominion or control over the

---

[7] In its findings of fact made in conjunction with Continental's plea for injunctive relief, the District Court rejected Sylvania's claim that its actions were prompted by independent concerns over Continental's credit. The jury's verdict is ambiguous on this point. In any event, we do not consider it relevant to the issue before us.

[8] Although Sylvania contended in the District Court that its policy was unilaterally enforced, it now concedes that its location restriction involved understandings or agreements with the retailers.

products sold to the dealer, after having parted with title and risk to the products, you must find any effort thereafter to restrict outlets or store locations from which its dealers resold the merchandise which they had purchased from Sylvania to be a violation of Section 1 of the Sherman Act, regardless of the reasonableness of the location restrictions." App. 492.

In answers to special interrogatories, the jury found that Sylvania had engaged "in a contract, combination or conspiracy in restraint of trade in violation of the antitrust laws with respect to location restrictions alone," and assessed Continental's damages at $591,505, which was trebled pursuant to 15 U. S. C. § 15 to produce an award of $1,774,515. App. 498, 501.[9]

On appeal, the Court of Appeals for the Ninth Circuit, sitting en banc, reversed by a divided vote. 537 F. 2d 980 (1976). The court acknowledged that there is language in *Schwinn* that could be read to support the District Court's instruction but concluded that *Schwinn* was distinguishable on several grounds. Contrasting the nature of the restrictions, their competitive impact, and the market shares of the franchisers in the two cases, the court concluded that Sylvania's location restriction had less potential for competitive harm than the restrictions invalidated in *Schwinn* and thus should be judged under the "rule of reason" rather than the *per se* rule stated in *Schwinn*. The court found support for its

---

[9] The jury also found that Maguire had not conspired with Sylvania with respect to this violation. Other claims made by Continental were either rejected by the jury or withdrawn by Continental. Most important was the jury's rejection of the allegation that the location restriction was part of a larger scheme to fix prices. A pendent claim that Sylvania and Maguire had willfully and maliciously caused injury to Continental's business in violation of California law also was rejected by the jury, and a pendent breach-of-contract claim was withdrawn by Continental during the course of the proceedings. The parties eventually stipulated to a judgment for Maguire on its claim against Continental.

position in the policies of the Sherman Act and in the decisions of other federal courts involving nonprice vertical restrictions.[10]

We granted Continental's petition for certiorari to resolve this important question of antitrust law. 429 U. S. 893 (1976).[11]

## II

## A

We turn first to Continental's contention that Sylvania's restriction on retail locations is a *per se* violation of § 1 of the Sherman Act as interpreted in *Schwinn*. The restrictions at issue in *Schwinn* were part of a three-tier distribution system comprising, in addition to Arnold, Schwinn & Co. (Schwinn), 22 intermediate distributors and a network of franchised retailers. Each distributor had a defined geographic area in which it had the exclusive right to supply franchised retailers. Sales to the public were made only through franchised retailers, who were authorized to sell Schwinn bicycles only from specified locations. In support of this limitation, Schwinn prohibited both distributors and retailers from selling Schwinn bicycles to nonfranchised retailers. At the retail level, therefore, Schwinn was able to control the number of retailers of

---

[10] There were two major dissenting opinions. Judge Kilkenny argued that the present case is indistinguishable from *Schwinn* and that the jury had been correctly instructed. Agreeing with Judge Kilkenny's interpretation of *Schwinn*, Judge Browning stated that he found the interpretation responsive to and justified by the need to protect " 'individual traders from unnecessary restrictions upon their freedom of action.' " 537 F. 2d, at 1021. See n. 21, *infra*.

[11] This Court has never given plenary consideration to the question of the proper antitrust analysis of location restrictions. Before *Schwinn* such restrictions had been sustained in *Boro Hall Corp.* v. *General Motors Corp.*, 124 F. 2d 822 (CA2 1942). Since the decision in *Schwinn,* location restrictions have been sustained by three Courts of Appeals, including the decision below. *Salco Corp.* v. *General Motors Corp.*, 517 F. 2d 567 (CA10 1975); *Kaiser* v. *General Motors Corp.*, 396 F. Supp. 33 (ED Pa. 1975), affirmance order, 530 F. 2d 964 (CA3 1976).

its bicycles in any given area according to its view of the needs of that market.

As of 1967 approximately 75% of Schwinn's total sales were made under the "Schwinn Plan." Acting essentially as a manufacturer's representative or sales agent, a distributor participating in this plan forwarded orders from retailers to the factory. Schwinn then shipped the ordered bicycles directly to the retailer, billed the retailer, bore the credit risk, and paid the distributor a commission on the sale. Under the Schwinn Plan, the distributor never had title to or possession of the bicycles. The remainder of the bicycles moved to the retailers through the hands of the distributors. For the most part, the distributors functioned as traditional wholesalers with respect to these sales, stocking an inventory of bicycles owned by them to supply retailers with emergency and "fill-in" requirements. A smaller part of the bicycles that were physically distributed by the distributors were covered by consignment and agency arrangements that had been developed to deal with particular problems of certain distributors. Distributors acquired title only to those bicycles that they purchased as wholesalers; retailers, of course, acquired title to all of the bicycles ordered by them.

In the District Court, the United States charged a continuing conspiracy by Schwinn and other alleged co-conspirators to fix prices, allocate exclusive territories to distributors, and confine Schwinn bicycles to franchised retailers. Relying on *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707 (1944), the Government argued that the nonprice restrictions were *per se* illegal as part of a scheme for fixing the retail prices of Schwinn bicycles. The District Court rejected the price-fixing allegation because of a failure of proof and held that Schwinn's limitation of retail bicycle sales to franchised retailers was permissible under § 1. The court found a § 1 violation, however, in "a conspiracy to divide certain borderline or overlapping counties in the territories served by four Midwestern

cycle distributors." 237 F. Supp. 323, 342 (ND Ill. 1965). The court described the violation as a "division of territory by agreement between the distributors . . . horizontal in nature," and held that Schwinn's participation did not change that basic characteristic. *Ibid.* The District Court limited its injunction to apply only to the territorial restrictions on the resale of bicycles purchased by the distributors in their roles as wholesalers. *Ibid.*

*Schwinn* came to this Court on appeal by the United States from the District Court's decision. Abandoning its *per se* theories, the Government argued that Schwinn's prohibition against distributors' and retailers' selling Schwinn bicycles to nonfranchised retailers was unreasonable under § 1 and that the District Court's injunction against exclusive distributor territories should extend to all such restrictions regardless of the form of the transaction. The Government did not challenge the District Court's decision on price fixing, and Schwinn did not challenge the decision on exclusive distributor territories.

The Court acknowledged the Government's abandonment of its *per se* theories and stated that the resolution of the case would require an examination of "the specifics of the challenged practices and their impact upon the marketplace in order to make a judgment as to whether the restraint is or is not 'reasonable' in the special sense in which § 1 of the Sherman Act must be read for purposes of this type of inquiry." 388 U. S., at 374. Despite this description of its task, the Court proceeded to articulate the following "bright line" *per se* rule of illegality for vertical restrictions: "Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." *Id.*, at 379. But the Court expressly stated that the rule of reason governs when "the manufacturer retains title, dominion, and risk with

respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer." *Id.*, at 380.

Application of these principles to the facts of *Schwinn* produced sharply contrasting results depending upon the role played by the distributor in the distribution system. With respect to that portion of Schwinn's sales for which the distributors acted as ordinary wholesalers, buying and reselling Schwinn bicycles, the Court held that the territorial and customer restrictions challenged by the Government were *per se* illegal. But, with respect to that larger portion of Schwinn's sales in which the distributors functioned under the Schwinn Plan and under the less common consignment and agency arrangements, the Court held that the same restrictions should be judged under the rule of reason. The only retail restriction challenged by the Government prevented franchised retailers from supplying nonfranchised retailers. *Id.*, at 377. The Court apparently perceived no material distinction between the restrictions on distributors and retailers, for it held:

> "The principle is, of course, equally applicable to sales to retailers, and the decree should similarly enjoin the making of any sales to retailers upon any condition, agreement or understanding limiting the retailer's freedom as to where and to whom it will resell the products." *Id.*, at 378.

Applying the rule of reason to the restrictions that were not imposed in conjunction with the sale of bicycles, the Court had little difficulty finding them all reasonable in light of the competitive situation in "the product market as a whole." *Id.*, at 382.

## B

In the present case, it is undisputed that title to the television sets passed from Sylvania to Continental. Thus, the *Schwinn per se* rule applies unless Sylvania's restriction on

locations falls outside *Schwinn*'s prohibition against a manufacturer's attempting to restrict a "retailer's freedom as to where and to whom it will resell the products." *Id.*, at 378. As the Court of Appeals conceded, the language of *Schwinn* is clearly broad enough to apply to the present case. Unlike the Court of Appeals, however, we are unable to find a principled basis for distinguishing *Schwinn* from the case now before us.

Both Schwinn and Sylvania sought to reduce but not to eliminate competition among their respective retailers through the adoption of a franchise system. Although it was not one of the issues addressed by the District Court or presented on appeal by the Government, the Schwinn franchise plan included a location restriction similar to the one challenged here. These restrictions allowed Schwinn and Sylvania to regulate the amount of competition among their retailers by preventing a franchisee from selling franchised products from outlets other than the one covered by the franchise agreement. To exactly the same end, the Schwinn franchise plan included a companion restriction, apparently not found in the Sylvania plan, that prohibited franchised retailers from selling Schwinn products to nonfranchised retailers. In *Schwinn* the Court expressly held that this restriction was impermissible under the broad principle stated there. In intent and competitive impact, the retail-customer restriction in *Schwinn* is indistinguishable from the location restriction in the present case. In both cases the restrictions limited the freedom of the retailer to dispose of the purchased products as he desired. The fact that one restriction was addressed to territory and the other to customers is irrelevant to functional antitrust analysis and, indeed, to the language and broad thrust of the opinion in *Schwinn*.[12]  As Mr. Chief Justice Hughes stated in

---

[12] The distinctions drawn by the Court of Appeals and endorsed in Mr. Justice White's separate opinion have no basis in *Schwinn*. The intrabrand competitive impact of the restrictions at issue in *Schwinn*

*Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 360, 377 (1933): "Realities must dominate the judgment. . . . The Anti-Trust Act aims at substance."

### III

Sylvania argues that if *Schwinn* cannot be distinguished, it should be reconsidered. Although *Schwinn* is supported by the principle of *stare decisis, Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 736 (1977), we are convinced that the need for clarification of the law in this area justifies reconsideration. *Schwinn* itself was an abrupt and largely unexplained departure from *White Motor Co.* v. *United States,* 372 U. S. 253 (1963), where only four years earlier the Court had refused to endorse a *per se* rule for vertical restrictions. Since its announcement, *Schwinn* has been the subject of continuing controversy and confusion, both in the scholarly journals and in the federal courts. The great weight of scholarly opinion

---

ranged from complete elimination to mere reduction; yet, the Court did not even hint at any distinction on this ground. Similarly, there is no suggestion that the *per se* rule was applied because of Schwinn's prominent position in its industry. That position was the same whether the bicycles were sold or consigned, but the Court's analysis was quite different. In light of MR. JUSTICE WHITE's emphasis on the "superior consumer acceptance" enjoyed by the Schwinn brand name, *post,* at 63, we note that the Court rejected precisely that premise in *Schwinn.* Applying the rule of reason to the restrictions imposed in nonsale transactions, the Court stressed that there was "no showing that [competitive bicycles were] not in all respects reasonably interchangeable as articles of competitive commerce with the Schwinn product" and that it did "not regard Schwinn's claim of product excellence as establishing the contrary." 388 U. S., at 381, and n. 7. Although *Schwinn* did hint at preferential treatment for new entrants and failing firms, the District Court below did not even submit Sylvania's claim that it was failing to the jury. Accordingly, MR. JUSTICE WHITE's position appears to reflect an extension of *Schwinn* in this regard. Having crossed the "failing firm" line, MR. JUSTICE WHITE attempts neither to draw a new one nor to explain why one should be drawn at all.

has been critical of the decision,[13] and a number of the federal courts confronted with analogous vertical restrictions have sought to limit its reach.[14]   In our view, the experience of the

[13] A former Assistant Attorney General in charge of the Antitrust Division has described *Schwinn* as "an exercise in barren formalism" that is "artificial and unresponsive to the competitive needs of the real world."   Baker, Vertical Restraints in Times of Change: From *White* to *Schwinn* to Where?, 44 Antitrust L. J. 537 (1975).   See, *e. g.,* Handler, The Twentieth Annual Antitrust Review—1967, 53 Va. L. Rev. 1667 (1967); McLaren, Territorial and Customer Restrictions, Consignments, Suggested Retail Prices and Refusals to Deal, 37 Antitrust L. J. 137 (1968); Pollock, Alternative Distribution Methods After *Schwinn,* 63 Nw. U. L. Rev. 595 (1968); Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum. L. Rev. 282 (1975); Robinson, Recent Antitrust Developments: 1974, 75 Colum. L. Rev. 243 (1975); Note, Vertical Territorial and Customer Restrictions in the Franchising Industry, 10 Colum. J. L. & Soc. Prob. 497 (1974); Note, Territorial and Customer Restrictions: A Trend Toward a Broader Rule of Reason?, 40 Geo. Wash. L. Rev. 123 (1971); Note, Territorial Restrictions and Per Se Rules—A Re-evaluation of the *Schwinn* and *Sealy* Doctrines, 70 Mich. L. Rev. 616 (1972).   But see Louis, Vertical Distributional Restraints Under *Schwinn* and *Sylvania:* An Argument for the Continuing Use of a Partial Per Se Approach, 75 Mich. L. Rev. 275 (1976); Zimmerman, Distribution Restrictions After *Sealy* and *Schwinn,* 12 Antitrust Bull. 1181 (1967).   For a more inclusive list of articles and comments, see 537 F. 2d, at 988 n. 13.

[14] Indeed, as one commentator has observed, many courts "have struggled to distinguish or limit *Schwinn* in ways that are a tribute to judicial ingenuity."   Robinson, *supra,* n. 13, at 272.   Thus, the statement in *Schwinn* that post-sale vertical restrictions as to customers or territories are "unreasonable without more," 388 U. S., at 379, has been interpreted to allow an exception to the *per se* rule where the manufacturer proves "more" by showing that the restraints will protect consumers against injury and the manufacturer against product liability claims.   See, *e. g., Tripoli Co.* v. *Wella Corp.,* 425 F. 2d 932, 936–938 (CA3 1970) (en banc).   Similarly, the statement that Schwinn's enforcement of its restrictions had been " 'firm and resolute,' " 388 U. S., at 372, has been relied upon to distinguish cases lacking that element.   See, *e. g., Janel Sales Corp.* v. *Lanvin Parfums, Inc.,* 396 F. 2d 398, 406 (CA2 1968).   Other factual distinctions have been drawn to justify upholding territorial restrictions

past 10 years should be brought to bear on this subject of considerable commercial importance.

The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." Since the early years of this century a judicial gloss on this statutory language has established the "rule of reason" as the prevailing standard of analysis. *Standard Oil Co.* v. *United States,* 221 U. S. 1 (1911). Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.[15] *Per se* rules of il-

---

that would seem to fall within the scope of the *Schwinn per se* rule. See, *e. g., Carter-Wallace, Inc.* v. *United States,* 196 Ct. Cl. 35, 44–46, 449 F. 2d 1374, 1379–1380 (1971) (*per se* rule inapplicable when purchaser can avoid restraints by electing to buy product at higher price); *Colorado Pump & Supply Co.* v. *Febco, Inc.,* 472 F. 2d 637 (CA10 1973) (apparent territorial restriction characterized as primary responsibility clause). One Court of Appeals has expressly urged us to consider the need in this area for greater flexibility. *Adolph Coors Co.* v. *FTC,* 497 F. 2d 1178, 1187 (CA10 1974). The decision in *Schwinn* and the developments in the lower courts have been exhaustively surveyed in ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition (1977) (ABA Monograph No. 2).

[15] One of the most frequently cited statements of the rule of reason is that of Mr. Justice Brandeis in *Chicago Bd. of Trade* v. *United States,* 246 U. S. 231, 238 (1918):

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because

legality are appropriate only when they relate to conduct that is manifestly anticompetitive. As the Court explained in *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5 (1958), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." [16]

In essence, the issue before us is whether *Schwinn*'s *per se* rule can be justified under the demanding standards of *Northern Pac. R. Co.* The Court's refusal to endorse a *per se* rule in *White Motor Co.* was based on its uncertainty as to whether vertical restrictions satisfied those standards. Addressing this question for the first time, the Court stated:

> "We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' (*Northern Pac. R. Co.* v. *United States, supra,* p. 5) and therefore should

knowledge of intent may help the court to interpret facts and to predict consequences."

[16] *Per se* rules thus require the Court to make broad generalizations about the social utility of particular commercial practices. The probability that anticompetitive consequences will result from a practice and the severity of those consequences must be balanced against its procompetitive consequences. Cases that do not fit the generalization may arise, but a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them. Once established, *per se* rules tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system of the more complex rule-of-reason trials, see *Northern Pac. R. Co.* v. *United States,* 356 U. S., at 5; *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 609–610 (1972), but those advantages are not sufficient in themselves to justify the creation of *per se* rules. If it were otherwise, all of antitrust law would be reduced to *per se* rules, thus introducing an unintended and undesirable rigidity in the law.

be classified as *per se* violations of the Sherman Act." 372 U. S., at 263.

Only four years later the Court in *Schwinn* announced its sweeping *per se* rule without even a reference to *Northern Pac. R. Co.* and with no explanation of its sudden change in position.[17] We turn now to consider *Schwinn* in light of *Northern Pac. R. Co.*

The market impact of vertical restrictions [18] is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand com-

---

[17] After *White Motor Co.*, the Courts of Appeals continued to evaluate territorial restrictions according to the rule of reason. *Sandura Co.* v. *FTC*, 339 F. 2d 847 (CA6 1964); *Snap-On Tools Corp.* v. *FTC*, 321 F. 2d 825 (CA7 1963). For an exposition of the history of the antitrust analysis of vertical restrictions before *Schwinn*, see ABA Monograph No. 2, pp. 6–8.

[18] As in *Schwinn*, we are concerned here only with nonprice vertical restrictions. The *per se* illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy. As MR. JUSTICE WHITE notes, *post*, at 69–70, some commentators have argued that the manufacturer's motivation for imposing vertical price restrictions may be the same as for nonprice restrictions. There are, however, significant differences that could easily justify different treatment. In his concurring opinion in *White Motor Co.* v. *United States*, MR. JUSTICE BRENNAN noted that, unlike nonprice restrictions, "[r]esale price maintenance is not only designed to, but almost invariably does in fact, reduce price competition not only *among* sellers of the affected product, but quite as much *between* that product and competing brands." 372 U. S., at 268. Professor Posner also recognized that "industry-wide resale price maintenance might facilitate cartelizing." Posner, *supra*, n. 13, at 294 (footnote omitted); see R. Posner, Antitrust: Cases, Economic Notes and Other Materials 134 (1974); E. Gellhorn, Antitrust Law and Economics 252 (1976); Note, 10 Colum. J. L. & Soc. Prob., *supra*, n. 13, at 498 n. 12. Furthermore, Congress recently has expressed its approval of a *per se* analysis of vertical price restrictions by repealing those provisions of the Miller-Tydings and McGuire Acts allowing fair-trade pricing at the option of the individual States. Consumer Goods Pricing Act of 1975, 89 Stat. 801, amending 15 U. S. C. §§ 1, 45 (a). No similar expression of congressional intent exists for nonprice restrictions.

52

petition.[19]  Significantly, the Court in *Schwinn* did not distinguish among the challenged restrictions on the basis of their individual potential for intrabrand harm or interbrand benefit.  Restrictions that completely eliminated intrabrand competition among Schwinn distributors were analyzed no differently from those that merely moderated intrabrand competition among retailers.  The pivotal factor was the passage of title: All restrictions were held to be *per se* illegal where title had passed, and all were evaluated and sustained under the rule of reason where it had not.  The location restriction at issue here would be subject to the same pattern of analysis under *Schwinn*.

It appears that this distinction between sale and nonsale transactions resulted from the Court's effort to accommodate the perceived intrabrand harm and interbrand benefit of vertical restrictions.  The *per se* rule for sale transactions reflected the view that vertical restrictions are "so obviously destructive" of intrabrand competition [20] that their use would "open the door to exclusivity of outlets and limitation of ter-

---

[19] Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law.  The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer.  In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

The degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer.  Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand competition among the distributors of a product produced by a firm in a highly competitive industry.  But when interbrand competition exists, as it does among television manufacturers, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.

[20] The Court did not specifically refer to intrabrand competition, but this meaning is clear from the context.

ritory further than prudence permits." 388 U. S., at 379–380.[21] Conversely, the continued adherence to the traditional rule of reason for nonsale transactions reflected the view that the restrictions have too great a potential for the promotion of interbrand competition to justify complete prohibition.[22]

[21] The Court also stated that to impose vertical restrictions in sale transactions would "violate the ancient rule against restraints on alienation." 388 U. S., at 380. This isolated reference has provoked sharp criticism from virtually all of the commentators on the decision, most of whom have regarded the Court's apparent reliance on the "ancient rule" as both a misreading of legal history and a perversion of antitrust analysis. See, e. g., Handler, supra, n. 13, at 1684–1686; Posner, supra, n. 13, at 295–296; Robinson, supra, n. 13, at 270–271; but see Louis, supra, n. 13, at 276 n. 6. We quite agree with MR. JUSTICE STEWART's dissenting comment in Schwinn that "the state of the common law 400 or even 100 years ago is irrelevant to the issue before us: the effect of the antitrust laws upon vertical distributional restraints in the American economy today." 388 U. S., at 392.

We are similarly unable to accept Judge Browning's interpretation of Schwinn. In his dissent below he argued that the decision reflects the view that the Sherman Act was intended to prohibit restrictions on the autonomy of independent businessmen even though they have no impact on "price, quality, and quantity of goods and services," 537 F. 2d, at 1019. This view is certainly not explicit in Schwinn, which purports to be based on an examination of the "impact [of the restrictions] upon the marketplace." 388 U. S., at 374. Competitive economies have social and political as well as economic advantages, see e. g., Northern Pac. R. Co. v. United States, 356 U. S., at 4, but an antitrust policy divorced from market considerations would lack any objective benchmarks. As Mr. Justice Brandeis reminded us: "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." Chicago Bd. of Trade v. United States, 246 U. S., at 238. Although MR. JUSTICE WHITE's opinion endorses Judge Browning's interpretation, post, at 66–68, it purports to distinguish Schwinn on grounds inconsistent with that interpretation, post, at 71.

[22] In that regard, the Court specifically stated that a more complete prohibition "might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers." 388 U. S., at 380. The Court also broadly hinted that it would recognize additional exceptions to the per se

The Court's opinion provides no analytical support for these contrasting positions. Nor is there even an assertion in the opinion that the competitive impact of vertical restrictions is significantly affected by the form of the transaction. Non-sale transactions appear to be excluded from the *per se* rule, not because of a greater danger of intrabrand harm or a greater promise of interbrand benefit, but rather because of the Court's unexplained belief that a complete *per se* prohibition would be too "inflexibl[e]." *Id.*, at 379.

Vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers. Location restrictions have this effect because of practical constraints on the effective marketing area of retail outlets. Although intrabrand competition may be reduced, the ability of retailers to exploit the resulting market may be limited both by the ability of consumers to travel to other franchised locations and, perhaps more importantly, to purchase the competing products of other manufacturers. None of these key variables, however, is affected by the form of the transaction by which a manufacturer conveys his products to the retailers.

Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision sustaining vertical restrictions under the rule of reason. Economists have identified a num-

---

rule for new entrants in an industry and for failing firms, both of which were mentioned in *White Motor* as candidates for such exceptions. 388 U. S., at 374. The Court might have limited the exceptions to the *per se* rule to these situations, which present the strongest arguments for the sacrifice of intrabrand competition for interbrand competition. Significantly, it chose instead to create the more extensive exception for nonsale transactions which is available to all businesses, regardless of their size, financial health, or market share. This broader exception demonstrates even more clearly the Court's awareness of the "redeeming virtues" of vertical restrictions.

ber of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. See, *e. g.,* Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp. Prob. 506, 511 (1965).[23] For example, new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did. Posner, *supra,* n. 13, at 285; cf. P. Samuelson, Economics 506–507 (10th ed. 1976).

---

[23] Marketing efficiency is not the only legitimate reason for a manufacturer's desire to exert control over the manner in which his products are sold and serviced. As a result of statutory and common-law developments, society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products. For example, at the federal level, apart from more specialized requirements, manufacturers of consumer products have safety responsibilities under the Consumer Product Safety Act, 15 U. S. C. § 2051 *et seq.* (1970 ed., Supp. V), and obligations for warranties under the Consumer Product Warranties Act, 15 U. S. C. § 2301 *et seq.* (1970 ed., Supp. V). Similar obligations are imposed by state law. See, *e. g.,* Cal. Civ. Code Ann. § 1790 *et seq.* (West 1973). The legitimacy of these concerns has been recognized in cases involving vertical restrictions. See, *e. g., Tripoli Co.* v. *Wella Corp.,* 425 F. 2d 932 (CA3 1970).

Economists also have argued that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products. Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division [II], 75 Yale L. J. 373, 403 (1966); Posner, *supra,* n. 13, at 283, 287–288.[24] Although the view that the manufacturer's interest necessarily corresponds with that of the public is not universally shared, even the leading critic of vertical restrictions concedes that *Schwinn*'s distinction between sale and nonsale transactions is essentially unrelated to any relevant economic impact. Comanor, Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath, 81 Harv. L. Rev. 1419, 1422 (1968).[25] Indeed, to the extent that the form of the transaction is related to interbrand benefits, the Court's distinction is inconsistent with its articulated concern for the ability of smaller firms to compete effectively with larger ones. Capital requirements and administrative expenses may prevent smaller firms from using the exception for nonsale transactions. See, *e. g.,* Baker, *supra,* n. 13, at 538; Phillips, *Schwinn* Rules and the "New Economics" of Vertical

---

[24] "Generally a manufacturer would prefer the lowest retail price possible, once its price to dealers has been set, because a lower retail price means increased sales and higher manufacturer revenues." Note, 88 Harv. L. Rev. 636, 641 (1975). In this context, a manufacturer is likely to view the difference between the price at which it sells to its retailers and their price to the consumer as its "cost of distribution," which it would prefer to minimize. Posner, *supra,* n. 13, at 283.

[25] Professor Comanor argues that the promotional activities encouraged by vertical restrictions result in product differentiation and, therefore, a decrease in interbrand competition. This argument is flawed by its necessary assumption that a large part of the promotional efforts resulting from vertical restrictions will not convey socially desirable information about product availability, price, quality, and services. Nor is it clear that a *per se* rule would result in anything more than a shift to less efficient methods of obtaining the same promotional effects.

Relation, 44 Antitrust L. J. 573, 576 (1975); Pollock, *supra*, n. 13, at 610.[26]

We conclude that the distinction drawn in *Schwinn* between sale and nonsale transactions is not sufficient to justify the application of a *per se* rule in one situation and a rule of reason in the other. The question remains whether the *per se* rule stated in *Schwinn* should be expanded to include nonsale transactions or abandoned in favor of a return to the rule of reason. We have found no persuasive support for expanding the *per se* rule. As noted above, the *Schwinn* Court recognized the undesirability of "prohibit[ing] all vertical restrictions of territory and all franchising . . . ." 388 U. S., at 379–380.[27] And even Continental does not urge us to hold that all such restrictions are *per se* illegal.

We revert to the standard articulated in *Northern Pac. R. Co.*, and reiterated in *White Motor*, for determining whether vertical restrictions must be "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." 356 U. S., at 5. Such restrictions, in varying forms, are widely used in our free market economy. As indicated above, there is substantial scholarly and judicial au-

---

[26] We also note that *per se* rules in this area may work to the ultimate detriment of the small businessmen who operate as franchisees. To the extent that a *per se* rule prevents a firm from using the franchise system to achieve efficiencies that it perceives as important to its successful operation, the rule creates an incentive for vertical integration into the distribution system, thereby eliminating to that extent the role of independent businessmen. See, *e. g.*, Keck, The *Schwinn* Case, 23 Bus. Law. 669 (1968); Pollock, *supra*, n. 13, at 608–610.

[27] Continental's contention that balancing intrabrand and interbrand competitive effects of vertical restrictions is not a "proper part of the judicial function," Brief for Petitioners 52, is refuted by *Schwinn* itself. *United States* v. *Topco Associates, Inc.*, 405 U. S., at 608, is not to the contrary, for it involved a horizontal restriction among ostensible competitors.

thority supporting their economic utility. There is relatively little authority to the contrary.[28] Certainly, there has been no showing in this case, either generally or with respect to Sylvania's agreements, that vertical restrictions have or are likely to have a "pernicious effect on competition" or that they "lack . . . any redeeming virtue." *Ibid.*[29] Accordingly, we conclude that the *per se* rule stated in *Schwinn* must be overruled.[30] In so holding we do not foreclose the possibility that particular applications of vertical restrictions might justify *per se* prohibition under *Northern Pac. R. Co.* But we do make clear that departure from the rule-of-reason standard

[28] There may be occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers. There is no doubt that restrictions in the latter category would be illegal *per se*, see, *e. g., United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *United States* v. *Topco Associates, Inc., supra,* but we do not regard the problems of proof as sufficiently great to justify a *per se* rule.

[29] The location restriction used by Sylvania was neither the least nor the most restrictive provision that it could have used. See ABA Monograph No. 2, pp. 20–25. But we agree with the implicit judgment in *Schwinn* that a *per se* rule based on the nature of the restriction is, in general, undesirable. Although distinctions can be drawn among the frequently used restrictions, we are inclined to view them as differences of degree and form. See Robinson, *supra,* n. 13, at 279–280; Averill, Sealy, Schwinn and Sherman One: An Analysis and Prognosis, 15 N. Y. L. F. 39, 65 (1969). We are unable to perceive significant social gain from channeling transactions into one form or another. Finally, we agree with the Court in *Schwinn* that the advantages of vertical restrictions should not be limited to the categories of new entrants and failing firms. Sylvania was faltering, if not failing, and we think it would be unduly artificial to deny it the use of valuable competitive tools.

[30] The importance of *stare decisis* is, of course, unquestioned, but as Mr. Justice Frankfurter· stated in *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940), *"stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience."

must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing.

In sum, we conclude that the appropriate decision is to return to the rule of reason that governed vertical restrictions prior to *Schwinn*. When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act. Accordingly, the decision of the Court of Appeals is

*Affirmed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, concurring in the judgment.

Although I agree with the majority that the location clause at issue in this case is not a *per se* violation of the Sherman Act and should be judged under the rule of reason, I cannot agree that this result requires the overruling of *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967). In my view this case is distinguishable from *Schwinn* because there is less potential for restraint of intrabrand competition and more potential for stimulating interbrand competition. As to intrabrand competition, Sylvania, unlike Schwinn, did not restrict the customers to whom or the territories where its purchasers could sell. As to interbrand competition, Sylvania, unlike Schwinn, had an insignificant market share at the time it adopted its challenged distribution practice and enjoyed no consumer preference that would allow its retailers to charge a premium over other brands. In two short paragraphs, the majority disposes of the view, adopted after careful analysis by the Ninth Circuit en banc below, that these differences provide a "principled basis for distinguishing *Schwinn,*" *ante,* at 46, despite holdings by three Courts of Appeals and the District Court on remand in *Schwinn* that

60

the *per se* rule established in that case does not apply to location clauses such as Sylvania's. To reach out to overrule one of this Court's recent interpretations of the Sherman Act, after such a cursory examination of the necessity for doing so, is surely an affront to the principle that considerations of *stare decisis* are to be given particularly strong weight in the area of statutory construction. *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 736–737 (1977); *Runyon* v. *McCrary,* 427 U. S. 160, 175 (1976); *Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974).

One element of the system of interrelated vertical restraints invalidated in *Schwinn* was a retail-customer restriction prohibiting franchised retailers from selling Schwinn products to nonfranchised retailers. The Court rests its inability to distinguish *Schwinn* entirely on this retail-customer restriction, finding it "[i]n intent and competitive impact . . . indistinguishable from the location restriction in the present case," because "[i]n both cases the restrictions limited the freedom of the retailer to dispose of the purchased products as he desired." *Ante,* at 46. The customer restriction may well have, however, a very different "intent and competitive impact" than the location restriction: It prevents discount stores from getting the manufacturer's product and thus prevents intrabrand price competition. Suppose, for example, that interbrand competition is sufficiently weak that the franchised retailers are able to charge a price substantially above wholesale. Under a location restriction, these franchisers are free to sell to discount stores seeking to exploit the potential for sales at prices below the prevailing retail level. One of the franchised retailers may be tempted to lower its price and act in effect as a wholesaler for the discount house in order to share in the profits to be had from lowering prices and expanding volume.[1]

---

[1] The franchised retailers would be prevented from engaging in discounting themselves if, under the *Colgate* doctrine, see *infra,* at 67, the

Under a retail customer restriction, on the other hand, the franchised dealers cannot sell to discounters, who are cut off altogether from the manufacturer's product and the opportunity for intrabrand price competition. This was precisely the theory on which the Government successfully challenged Schwinn's customer restrictions in this Court. The District Court in that case found that "[e]ach one of [Schwinn's franchised retailers] knows also that he is not a wholesaler and that he cannot sell as a wholesaler or act as an agent for some other unfranchised dealer, such as a discount house retailer who has not been franchised as a dealer by Schwinn." 237 F. Supp. 323, 333 (ND Ill. 1965). The Government argued on appeal, with extensive citations to the record, that the effect of this restriction was "to keep Schwinn products out of the hands of discount houses and other price cutters so as to discourage price competition in retailing . . . ." Brief for United States, O. T. 1966, No. 25, p. 26. See *id.*, at 29–37.[2]

It is true that, as the majority states, Sylvania's location restriction inhibited to some degree "the freedom of the retailer to dispose of the purchased products" by requiring the retailer to sell from one particular place of business. But the retailer is still free to sell to any type of customer—including discounters and other unfranchised dealers—from any area. I think this freedom implies a significant difference for the effect of a location clause on intrabrand competition. The

---

manufacturer could lawfully terminate dealers who did not adhere to his suggested retail price.

[2] Given the Government's emphasis on the inhibiting effect of the Schwinn restrictions on discounting activities, the Court may well have been referring to this effect when it condemned the restrictions as "obviously destructive of competition." 388 U. S., at 379. But the Court was also heavily influenced by its concern for the freedom of dealers to control the disposition of products they purchased from Schwinn. See *infra,* at 66–69. In any event, the record in *Schwinn* illustrates the potentially greater threat to intrabrand competition posed by customer as opposed to location restrictions.

District Court on remand in *Schwinn* evidently thought so as well, for after enjoining Schwinn's customer restrictions as directed by this Court it expressly sanctioned location clauses, permitting Schwinn to "designat[e] in its retailer franchise agreements the location of the place or places of business for which the franchise is issued." 291 F. Supp. 564, 565–566 (ND Ill. 1968).

An additional basis for finding less restraint of intrabrand competition in this case, emphasized by the Ninth Circuit en banc, is that *Schwinn* involved restrictions on competition among distributors at the wholesale level. As Judge Ely wrote for the six-member majority below:

> "[Schwinn] had created exclusive geographical sales territories for each of its 22 wholesaler bicycle distributors and had made each distributor the sole Schwinn outlet for the distributor's designated area. Each distributor was prohibited from selling to any retailers located outside its territory. . . .
>
> ". . . Schwinn's territorial restrictions requiring dealers to confine their sales to exclusive territories prescribed by Schwinn prevented a dealer from competing for customers outside his territory. . . . Schwinn's restrictions guaranteed each wholesale distributor that it would be absolutely isolated from all competition from other Schwinn wholesalers." 537 F. 2d 980, 989–990 (1976).

Moreover, like its franchised retailers, Schwinn's distributors were absolutely barred from selling to nonfranchised retailers, further limiting the possibilities of intrabrand price competition.

The majority apparently gives no weight to the Court of Appeals' reliance on the difference between the competitive effects of Sylvania's location clause and Schwinn's interlocking "system of vertical restraints affecting both wholesale and retail distribution." *Id.,* at 989. It also ignores post-*Schwinn*

decisions of the Third and Tenth Circuits upholding the validity of location clauses similar to Sylvania's here. *Salco Corp.* v. *General Motors Corp.*, 517 F. 2d 567 (CA10 1975); *Kaiser* v. *General Motors Corp.*, 530 F. 2d 964 (CA3 1976), aff'g 396 F. Supp. 33 (ED Pa. 1975). Finally, many of the scholarly authorities the majority cites in support of its overruling of *Schwinn* have not had to strain to distinguish location clauses from the restrictions invalidated there. *E. g.*, Robinson, Recent Antitrust Developments: 1974, 75 Colum. L. Rev. 243, 278 (1975) (outcome in *Sylvania* not preordained by *Schwinn* because of marked differences in the vertical restraints in the two cases); McLaren, Territorial and Customer Restrictions, Consignments, Suggested Retail Prices and Refusals to Deal, 37 Antitrust L. J. 137, 144–145 (1968) (by implication *Schwinn* exempts location clauses from its *per se* rule); Pollock, Alternative Distribution Methods After *Schwinn*, 63 Nw. U. L. Rev. 595, 603 (1968) ("Nor does the *Schwinn* doctrine outlaw the use of a so-called 'location clause' . . .").

Just as there are significant differences between *Schwinn* and this case with respect to intrabrand competition, there are also significant differences with respect to interbrand competition. Unlike Schwinn, Sylvania clearly had no economic power in the generic product market. At the time they instituted their respective distribution policies, Schwinn was "the leading bicycle producer in the Nation," with a national market share of 22.5%, 388 U. S., at 368, 374, whereas Sylvania was a "faltering, if not failing" producer of television sets, with "a relatively insignificant 1% to 2%" share of the national market in which the dominant manufacturer had a 60% to 70% share. *Ante,* at 38, 58 n. 29. Moreover, the Schwinn brand name enjoyed superior consumer acceptance and commanded a premium price as, in the District Court's words, "the Cadillac of the bicycle industry." 237 F. Supp., at 335. This premium gave Schwinn dealers a margin of

protection from interbrand competition and created the possibilities for price cutting by discounters that the Government argued were forestalled by Schwinn's customer restrictions.[3] Thus, judged by the criteria economists use to measure market power—product differentiation and market share [4]—Schwinn enjoyed a substantially stronger position in the bicycle market than did Sylvania in the television market. This Court relied on Schwinn's market position as one reason not to apply the rule of reason to the vertical restraints challenged there. "Schwinn was not a newcomer, seeking to break into or stay in the bicycle business. It was not a 'failing company.' On the contrary, at the initiation of these practices, it was the leading bicycle producer in the Nation." 388 U. S., at 374. And the Court of Appeals below found "another significant distinction between our case and *Schwinn*" in Sylvania's "precarious market share," which "was so small when it adopted its locations practice that it was threatened with expulsion from the television market." 537 F. 2d, at 991.[5]

---

[3] Relying on the finding of the District Court, the Government argued: "[T]he declared purpose of the Schwinn franchising system [was] to establish and exploit a distinctive identity and superior consumer acceptance for the Schwinn brand name as the Cadillac of bicycles, thereby enabling the charging of a premium price . . . . This scheme could not possibly succeed, and doubtless would long ago have been abandoned, if in the consumer's mind other bicycles were just as good as Schwinn's." Brief for United States, O. T. 1966, No. 25, p. 36.

[4] See, *e. g.*, F. Scherer, Industrial Market Structure and Economics Performance 10–11 (1970); P. Samuelson, Economics 485–491 (10th ed. 1976).

[5] Schwinn's national market share declined to 12.8% in the 10 years following the institution of its distribution program, at which time it ranked second behind a firm with a 22.8% share. 388 U. S., at 368–369. In the three years following the adoption of its locations practice, Sylvania's national market share increased to 5%, placing it eighth among manufacturers of color television sets. *Ante*, at 38–39. At this time Sylvania's shares of the San Francisco, Sacramento, and northern Cali-

In my view there are at least two considerations, both relied upon by the majority to justify overruling *Schwinn*, that would provide a "principled basis" for instead refusing to extend *Schwinn* to a vertical restraint that is imposed by a "faltering" manufacturer with a "precarious" position in a generic product market dominated by another firm. The first is that, as the majority puts it, "when interbrand competition exists, as it does among television manufacturers, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Ante,* at 52 n. 19. See also *ante,* at 54.[6] Second is the view, argued forcefully in the economic literature cited by the majority, that the potential benefits of vertical restraints in promoting interbrand competition are particularly strong where the manufacturer imposing the restraints is seeking to enter a new market or to expand a small market share. *Ibid.*[7] The majority even recognizes that *Schwinn* "hinted" at an exception for new entrants and failing firms from its *per se* rule. *Ante,* at 53–54, n. 22.

In other areas of antitrust law, this Court has not hesitated to base its rules of *per se* illegality in part on the defendant's market power. Indeed, in the very case from which the majority draws its standard for *per se* rules, *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5 (1958), the

---

fornia markets were respectively 2.5%, 15%, and 5%. *Ante,* at 39 nn. 4, 6. The District Court made no findings as to Schwinn's share of local bicycle markets.

[6] For an extensive discussion of this effect of interbrand competition, see ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition 60–67 (1977).

[7] Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp. Prob. 506, 511 (1965); Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum. L. Rev. 282, 293 (1975); Scherer, *supra,* n. 4, at 510.

Court stated the reach of the *per se* rule against tie-ins under § 1 of the Sherman Act as extending to all defendants with "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . ." 356 U. S., at 6. And the Court subsequently approved an exception to this *per se* rule for "infant industries" marketing a new product. *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp. 545 (ED Pa. 1960), aff'd *per curiam*, 365 U. S. 567 (1961). See also *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 363 (1963), where the Court held presumptively illegal a merger "which produces a firm controlling an undue percentage share of the relevant market . . . ." I see no doctrinal obstacle to excluding firms with such minimal market power as Sylvania's from the reach of the *Schwinn* rule.[8]

I have, moreover, substantial misgivings about the approach the majority takes to overruling *Schwinn*. The reason for the distinction in *Schwinn* between sale and nonsale transactions was not, as the majority would have it, "the Court's effort to accommodate the perceived intrabrand harm and interbrand benefit of vertical restrictions," *ante*, at 52; the reason was rather, as Judge Browning argued in dissent below, the notion in many of our cases involving vertical restraints that inde-

---

[8] Cf. *Sandura Co.* v. *FTC*, 339 F. 2d 847, 850 (CA6 1964) (territorial restrictions on distributors imposed by small manufacturer "competing with and losing ground to the 'giants' of the floor-covering industry" is not *per se* illegal); Baker, Vertical Restraints in Times of Change: From *White* to *Schwinn* to Where?, 44 Antitrust L. J. 537, 545–547 (1975) (presumptive illegality of territorial restrictions imposed by manufacturer with "any degree of market power"). The majority's failure to use the market share of Schwinn and Sylvania as a basis for distinguishing these cases is the more anomalous for its reliance, see *infra*, at 68–70, on the economic analysis of those who distinguish the anticompetitive effects of distribution restraints on the basis of the market shares of the distributors. See Posner, *supra*, at 299; Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division [II], 75 Yale L. J. 373, 391–429 (1966).

pendent businessmen should have the freedom to dispose of the goods they own as they see fit. Thus the first case cited by the Court in *Schwinn* for the proposition that "restraints upon alienation . . . are beyond the power of the manufacturer to impose upon its vendees and . . . are violations of § 1 of the Sherman Act," 388 U. S., at 377, was this Court's seminal decision holding a series of resale-price-maintenance agreements *per se* illegal, *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911). In *Dr. Miles* the Court stated that "a general restraint upon alienation is ordinarily invalid," citing Coke on Littleton, and emphasized that the case involved "agreements restricting the freedom of trade on the part of dealers who own what they sell." *Id.*, at 404, 407–408. Mr. Justice Holmes stated in dissent: "If [the manufacturer] should make the retail dealers also agents in law as well as in name and retain the title until the goods left their hands I cannot conceive that even the present enthusiasm for regulating the prices to be charged by other people would deny that the owner was acting within his rights." *Id.*, at 411.

This concern for the freedom of the businessman to dispose of his own goods as he sees fit is most probably the explanation for two subsequent cases in which the Court allowed manufacturers to achieve economic results similar to that in *Dr. Miles* where they did not impose restrictions on dealers who had purchased their products. In *United States* v. *Colgate & Co.*, 250 U. S. 300 (1919), the Court found no antitrust violation in a manufacturer's policy of refusing to sell to dealers who failed to charge the manufacturer's suggested retail price and of terminating dealers who did not adhere to that price. It stated that the Sherman Act did not "restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Id.*, at 307. In *United States* v. *General Electric Co.*, 272 U. S. 476 (1926), the Court upheld resale-price-maintenance

agreements made by a patentee with its dealers who obtained its goods on a consignment basis. The Court distinguished *Dr. Miles* on the ground that the agreements there were "contracts of sale rather than of agency" and involved "an attempt by the Miles Medical Company . . . to hold its purchasers, after the purchase at full price, to an obligation to maintain prices on a resale by them." 272 U. S., at 487. By contrast, a manufacturer was free to contract with his *agents* to "[fix] the price by which his agents transfer the title from him directly to [the] consumer . . . however comprehensive as a mass or whole in [the] effect [of these contracts]." *Id.,* at 488. Although these two cases have been called into question by subsequent decisions, see *United States* v. *Parke, Davis & Co.,* 362 U. S. 29 (1960), and *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964), their rationale runs through our case law in the area of distributional restraints. In *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,* 340 U. S. 211, 213 (1951), the Court held that an agreement to fix resale prices was *per se* illegal under § 1 because "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Accord, *Albrecht* v. *Herald Co.,* 390 U. S. 145, 152 (1968). See generally Judge Browning's dissent below, 537 F. 2d, at 1018–1022; ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition 29–31, 82–83, 87–91, 96–97 (1977); Blake & Jones, Toward a Three-Dimensional Antitrust Policy, 65 Colum. L. Rev. 422, 427–436 (1965).

After summarily rejecting this concern, reflected in our interpretations of the Sherman Act, for "the autonomy of independent businessmen," *ante,* at 53 n. 21, the majority not surprisingly finds "no justification" for *Schwinn's* distinction between sale and nonsale transactions because the distinction is "essentially unrelated to any relevant economic impact." *Ante,* at 56. But while according some weight to the business-

man's interest in controlling the terms on which he trades in his own goods may be anathema to those who view the Sherman Act as directed solely to economic efficiency,[9] this principle is without question more deeply embedded in our cases than the notions of "free rider" effects and distributional efficiencies borrowed by the majority from the "new economics of vertical relationships." *Ante,* at 54–57. Perhaps the Court is right in partially abandoning this principle and in judging the instant nonprice vertical restraints solely by their "relevant economic impact"; but the precedents which reflect this principle should not be so lightly rejected by the Court. The rationale of *Schwinn* is no doubt difficult to discern from the opinion, and it may be wrong; it is not, however, the aberration the majority makes it out to be here.

I have a further reservation about the majority's reliance on "relevant economic impact" as the test for retaining *per se* rules regarding vertical restraints. It is common ground among the leading advocates of a purely economic approach to the question of distribution restraints that the economic arguments in favor of allowing vertical nonprice restraints generally apply to vertical price restraints as well.[10] Although

---

[9] *E. g.,* Bork, Legislative Intent and the Policy of the Sherman Act, 9 J. Law & Econ. 7 (1966); Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division [I], 74 Yale L. J. 775 (1965).

[10] Professor Posner writes, for example:

"There is no basis for choosing between [price fixing and market division] on social grounds. If resale price maintenance is like dealer price fixing, and therefore bad, a manufacturer's assignment of exclusive sales territories is like market division, and therefore bad too . . . .

"[If helping new entrants break into a market] is a good justification for exclusive territories, it is an equally good justification for resale price maintenance, which as we have seen is simply another method of dealing with the free-rider problem. . . . In fact, *any* argument that can be made on behalf of exclusive territories can also be made on behalf of resale price maintenance." Posner, *supra,* n. 7, at 292–293. (Footnote omitted.)

See Bork, *supra,* n. 8, at 391–464.

the majority asserts that "the *per se* illegality of price restrictions . . . involves significantly different questions of analysis and policy," *ante,* at 51 n. 18, I suspect this purported distinction may be as difficult to justify as that of *Schwinn* under the terms of the majority's analysis. Thus Professor Posner, in an article cited five times by the majority, concludes: "I believe that the law should treat price and nonprice restrictions the same and that it should make no distinction between the imposition of restrictions in a sale contract and their imposition in an agency contract." Posner, *supra,* n. 7, at 298. Indeed, the Court has already recognized that resale price maintenance may increase output by inducing "demand-creating activity" by dealers (such as additional retail outlets, advertising and promotion, and product servicing) that outweighs the additional sales that would result from lower prices brought about by dealer price competition. *Albrecht* v. *Herald Co., supra,* at 151 n. 7. These same output-enhancing possibilities of nonprice vertical restraints are relied upon by the majority as evidence of their social utility and economic soundness, *ante,* at 55, and as a justification for judging them under the rule of reason. The effect, if not the intention, of the Court's opinion is necessarily to call into question the firmly established *per se* rule against price restraints.

Although the case law in the area of distributional restraints has perhaps been less than satisfactory, the Court would do well to proceed more deliberately in attempting to improve it. In view of the ample reasons for distinguishing *Schwinn* from this case and in the absence of contrary congressional action, I would adhere to the principle that

"each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions

is to be aplied." *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563, 579 (1925).

In order to decide this case, the Court need only hold that a location clause imposed by a manufacturer with negligible economic power in the product market has a competitive impact sufficiently less restrictive than the *Schwinn* restraints to justify a rule-of-reason standard, even if the same weight is given here as in *Schwinn* to dealer autonomy. I therefore concur in the judgment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

I would not overrule the *per se* rule stated in *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967), and would therefore reverse the decision of the Court of Appeals for the Ninth Circuit.