**GILCHRIST MACHINERY COMPANY, INC., Plaintiff,**

v.

**KOMATSU AMERICA CORP., et al., Defendants.**

Civ. A. No. J84–0156(L).

United States District Court, S.D. Mississippi, Jackson Division.

Dec. 21, 1984.

James A. Becker, Jr., Watkins & Eager, Fred A. Ross, Jr., Jackson, Miss., for plaintiff.

Alan W. Perry, Fred Krutz, III, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., Roger J. Fleischmann, Fleischmann & Farber, San Francisco, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

The plaintiff, Gilchrist Machinery Company, Inc., (Gilchrist Machinery) filed this action following termination of its franchise agreement with Komatsu America Corporation (KAC). Gilchrist Machinery seeks monetary and injunctive relief for injuries allegedly caused by KAC and several of its employees and by a conspiracy, composed of KAC, Head & Engquist Equipment Company (H&E) and W.W. Williams Company of Tennessee, Inc. (WWW), acting in violation of section 1 of the Sherman Act. The parties [1] entered an agreed order stating that the proposed termination would not take effect until a trial on the merits could be held or on December 13, 1984, whichever time came first. [2] When the trial date was postponed at the request of the parties, the plaintiff filed its motion for a preliminary injunction. After the issues were extensively briefed, the parties submitted evidence in a three day hearing before this court.

In 1975, Bob Gilchrist contacted representatives of KAC regarding his being appointed as a dealer of Komatsu products. Gilchrist also discussed the possibility of a franchise with other equipment manufacturers and in 1976 began plans for construction of a facility in Jackson, Mississippi. The plans for the building were expanded after KAC suggested that more space would be needed to handle sales and service of KAC products adequately. In April 1977, Bob Gilchrist signed a franchise agreement and became the KAC distributor for the central Mississippi territory. [3]

The contract, a standard form, was not negotiated but Gilchrist's attorney reviewed the document before its execution. The term of the contract was one year, after which either party could terminate the agreement, with or without cause, upon 90 days' notice. Gilchrist was aware of the termination provision because of his experience with other franchises in the industry which contain similar clauses. Furthermore, the parties discussed the clause before signing. Both parties anticipated that the relationship would be in their respective best interests and, therefore, would continue for an extended period.

After he obtained the franchise, Gilchrist made an initial order for machines and parts, ordering those that were, according to KAC, necessary for beginning the business. Pursuant to KAC's suggestion, Gilchrist also ordered a sign and participated in the company advertising program. [4] Plaintiff carried all of those products that KAC at the time exported to the United States. Since that time, KAC has begun to market other products but Gilchrist Machinery has not been approved to sell those items. According to Gilchrist, there was only one Komatsu machine in his territory when he began business, and his marketing program had to be aggressive to overcome the products' lack of recognition and the preference of consumers to buy from American manufacturers.

At the present time, Gilchrist Machinery's Komatsu business involves primarily rentals, rent-to-sell agreements, straight sales, and service and parts. In February 1984, the rental fleet consisted of approximately 60 machines. Plaintiff orders ma-

1. The plaintiff also named as defendants Komatsu, Ltd., W.W. Williams of Tennessee, Inc., Head & Enquist Equipment, Inc., Nobua Murai, T. Kobayashi, Takachika Anada, Douglas E. Nunnery and T. Endo. Defendants Komatsu, Ltd., Nobua Murai, T. Kobayashi, Takachika Anada and T. Endo have filed motions to dismiss which are pending before this court.

2. At the hearing on the plaintiff's motion for preliminary injunction, the parties entered an agreed order continuing the effect of said order through December 22, 1984.

3. Billy Joe Smith also signed as a partner in what was at that time Gilchrist-Smith Tractor Company. Soon after the execution of this agreement, however, Smith withdrew from the business and the company assumed the name, Gilchrist Machinery Company, Inc.

4. That the advertising program was voluntary is shown by the fact that Gilchrist chose not to participate in 1982.

chines and parts from KAC's southwest regional office in Arlington, Texas and obtains parts at 20% below the list price and 15% less than the list price for emergency orders. Gilchrist Machinery presently employs 37 people.

The original territory assigned to Gilchrist Machinery included 40 counties in central Mississippi. In 1978, plaintiff obtained the dealership for the southern part of Mississippi. In 1979, the KAC dealer in north Louisiana, Crown Equipment, was terminated and that territory was assigned to plaintiff, which constructed facilities in Shreveport in order to conduct the Louisiana business. Pursuant to KAC policy, a dealer's assigned territory is its area of primary responsibility, and while sales outside the territory are not prohibited, they are discouraged. It is the position of KAC that territorial restrictions are necessary to facilitate adequate service following sales. In 1980, Gilchrist Machinery solicited sales from Hill Brothers Construction Company, located in the north Mississippi territory of Tri-State Equipment Company. Doug Nunnery, of Tri-State, wrote Gilchrist and requested that these sales be discontinued. Nunnery promised that, if Gilchrist continued to do business in north Mississippi, he would retaliate with "Home Cooking". According to the plaintiff, this letter marks the beginning of a conspiracy which, three and a half years later, in January 1984, culminated in a letter advising that Gilchrist Machinery was terminated as a KAC dealer. The plaintiff contends that KAC gave preferential treatment to H & E, the south Louisiana distributor, and to WWW, Nunnery's present employer and the north Mississippi distributor, and also unreasonably restricted the availability of price discounts and credit to Gilchrist Machinery.

The plaintiff introduced a series of memoranda, commencing in 1980, from T. Endo, Southwest Regional Manager, to the President of KAC describing the poor financial condition and uncooperative attitude of Gilchrist Machinery.[5] According to those memos, Gilchrist Machinery was suffering severe financial problems, and, in an attempt to help plaintiff, KAC allowed the company to return some machines and parts to the manufacturer and did not offer other dealers this opportunity. During this time, KAC's Area Manager for plaintiff's territory, Phillip DeGrief, uncovered discrepancies between the inventory reports submitted by Gilchrist Machinery and the products actually located at the company facilities. In further attempts to help plaintiff, KAC also suspended the payment of interest on some machines and assisted in seeking outside financial help. Gilchrist Machinery approached other heavy equipment dealers concerning investing in or buying the company. In December of 1980, Regional Manager David O'Dell reported to KAC that plaintiff's inadequate service and management policies had involved KAC in as many as thirty law suits regarding warranty liability. The suits were filed by dissatisfied customers who allegedly received poor service because of plaintiff's consistent failure to comply with KAC's warranty requirements. In 1982, Gilchrist Machinery's financial difficulties continued and KAC negotiated several repayment plans. Gilchrist Machinery failed to comply with the payment schedules and KAC imposed strict credit restrictions, which were necessary to protect KAC's interest and to prevent plaintiff from becoming insolvent. KAC had previously suffered losses by allowing dealers to become heavily in debt to the company. Machines were shipped only after advance payment and parts which were ordered after exceeding the credit limit were only shipped C.O.D. In January 1983, Gilchrist met with Charles Sowers, Vice President of Marketing, concerning Gilchrist's poor market performance. Sowers stated that it was unlikely that Gilchrist Machinery would become a full line dealer and, in fact, questioned whether plaintiff would remain a dealer at all. In May of 1983, O'Dell wrote Gilchrist concerning Gilchrist Ma-

---

**5.** The court attaches no significance to the fact that the memos were originally written in Japanese, the native language of Endo and the KAC president.

chinery's unsatisfactory market share.[6] KAC uses statistics from CIMA (Construction Industry Manufacturers Association) to determine a particular distributor's market share. The statistics are compiled from information submitted by heavy equipment manufacturers who, in turn, receive the information from their distributors. Since the data involves only sales of new machinery, a dealer's transactions involving rentals and sales of used machinery are not included in the computation.[7] At the hearing, Bob Gilchrist stated that he chose to ignore O'Dell's letter and viewed it as further harassment by the regional manager. In July 1983, O'Dell accepted a job with H & E, the KAC distributor in south Louisiana. Taking the position that H & E would be a prospective replacement should Gilchrist Machinery fail, O'Dell recused himself from a review of plaintiff's marketing report. Before O'Dell left KAC's employ, he wrote a memorandum regarding the status of the dealers in his region to his successor, Steve Day. O'Dell stated that the cancellation of Gilchrist Machinery's dealership was likely and suggested three prospective replacements,[8] one of which was H & E. O'Dell refrained from comment about that company, stating that H & E was his future employer. In the fall of 1983, Gilchrist became current on its pay-

ments to KAC but the credit restrictions imposed earlier remained in effect.

In December 1983, Steve Day wrote Bob Gilchrist regarding the poor market share of Gilchrist Machinery.[9] He responded, challenging the figures used to compute the market share and stating that he would correct the statistics; however, he never did so in writing.[10] On January 25, 1984, KAC wrote Gilchrist expressing its intent to exercise the termination clause.

The criteria for the issuance of a preliminary injunction are well settled in the Fifth Circuit. The moving party must demonstrate:

1. A substantial likelihood that the movant will prevail on the merits;

2. A substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

3. That the threatened injury to the movant outweighs the threatened harm the injunction may do to the nonmoving party; and

4. That granting the preliminary injunction will not disserve the public interest. *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). A preliminary injunction is extraordinary relief and should only be granted upon a clear showing by the plaintiff. *Id.*

6. The letter stated:
 We calculate that Gilchrist Machinery is getting a tractor market share combined in both territories of approximately 4.1% for 1982. In our studies of the placements, we found that your Jackson store had approximately 6.7% of the market and your Princeton store had only 1.57% of the bulldozer market for 1982. Our company feels that each operation should have a minimum of 10% of the available market in its local trade area.

7. Basing the statistics on sales of new machinery ("first in the dirt") gives a more accurate representation of each manufacturer's market share. The market share data submitted by Gilchrist Machinery evidently included other transactions, hence the difference in percentages.

8. By 1982, KAC reports show that the cancellation of Gilchrist Machinery was being considered. The company had also considered terminating the franchise of H & E. H & E was

removed from the cancellation list after successful efforts to improve its market performance. Therefore, the court concludes that the listing of Gilchrist Machinery as a prospect for cancellation was not conclusive.

9. The letter stated:
 For 1982 Gilchrist Machinery obtained approximately 4.1% market share for Mississippi and North Louisiana combined. Through June of 1983 Gilchrist Machinery has been able to raise this figure to only 5%. In our calculation of 1982 figures, we showed that your Jackson store had approximately 6.7% of the market and your Louisiana store had approximately 1.57% of the market. Through June of this year we calculate your Jackson store to have approximately 7.5% of the market and your Louisiana store has approximately 2.1% of the available market.

10. At the hearing, Gilchrist did not specify the inaccuracies in the report.

## SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The plaintiff must first establish a substantial likelihood of success on the merits of its claim. The standard to be used by the court in determining whether the plaintiff has satisfied this requirement is flexible. *See Canal Authority,* 489 F.2d at 576. When the balance of harm to the parties tips clearly in favor of the plaintiff, the raising of a substantial question may be sufficient. *See Roland Machinery Company v. Dresser Industries, Inc.,* 1984–2 Trade Cases, ¶ 66,175 at 66,627 (7th Cir.1984). In this case, where the balance is not so clearly in the plaintiff's favor, the plaintiff must show that it is at least more likely than not to prevail. This more stringent standard is also appropriate in light of the extensive discovery that preceded the plaintiff's motion.[11]

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." In *Monsanto Company v. Spray-Rite Service Corporation,* — U.S. —, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the plaintiff, Spray-Rite, brought suit after the defendant, Monsanto, declined to renew its distributorship, and alleged that its termination was the result of a conspiracy between Monsanto and other distributors to fix prices. The United States Supreme Court stated that the standard of proof for finding a conspiracy was of great importance because independent action by a manufacturer is not prohibited by section 1 of the Sherman Act.

The Court held that, to find a conspiracy within the meaning of the Sherman Act,[12] "there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* — U.S. at —, 104 S.Ct. at 1471, 79 L.Ed.2d at 785. Relying on direct evidence that the manufacturer sought and received agreement to fix prices, as well as circumstantial evidence, the Court held that there was a price fixing conspiracy between Monsanto and its other distributors.

Independent action is not proscribed by section 1 of the Sherman Act. *Monsanto,* — U.S. at —, 104 S.Ct. at 1469, 79 L.Ed.2d at 783. Under the antitrust laws, a manufacturer is free to terminate a dealer and replace it with another. "The decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A." *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (cited with approval in *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1114–15 (5th Cir.1980)).

The evidence presented by Gilchrist Machinery shows that distributors complained to KAC about Gilchrist's extra-

---

**11.** This suit was filed in February 1984, and the parties have been in the discovery process since that time. They have represented to the court that discovery should be completed in February of 1985. Therefore, the plaintiff has access to more evidence than a party would in a hearing for preliminary injunction, which is generally held soon after the suit is filed and prior to any discovery.

**12.** *Monsanto* dealt with a vertical price fixing restraint. Viewed narrowly, the test set out by the Court is limited to that context. The Court's rationale was based in part on the need of

manufacturers to communicate freely with dealers and to investigate complaints without fear of antitrust liability. The same reasoning applies to the KAC restraint which this court determines to be non price-related. It is arguable that a less demanding test is applicable when review is governed by the rule of reason rather than the per se rule as was the case in *Monsanto.* In any event, this court cannot find, on the basis of the evidence presented by the plaintiffs, that the termination of Gilchrist Machinery was the result of concerted action between KAC and other distributors.

territorial sales. This alone, however, is not sufficient proof from which to infer a conspiracy. The evidence further shows that the complaints were registered several years before the termination. In addition, Gilchrist Machinery itself complained to KAC regarding sales in its territory by other distributors, including those selected to replace Gilchrist.[13] The plaintiff contends that KAC began "building a file" to terminate Gilchrist Machinery soon after receipt of Nunnery's "Home Cooking" letter in July of 1980. Bob Gilchrist testified that, after Nunnery's complaints, representatives of KAC reprimanded him for soliciting sales outside his territory and threatened to cancel his franchise if this activity continued.[14] It is true that the negative reports commenced at about that time. It is evident, however, that Gilchrist Machinery's market performance and financial status declined at approximately the same time. KAC has offered "plausible business explanations" to support its decision to terminate Gilchrist Machinery, and the court cannot infer a conspiracy from the allegations of the plaintiff.[15] *See Transource International, Inc. v. Trinity Industries, Inc.,* 725 F.2d 274, 282 (5th Cir.1984). Therefore, the plaintiff has

failed to raise substantial questions in its favor regarding its likelihood of success on the merits of its Sherman Act claim because of its failure to show that its termination was the result of concerted action. Even if the existence of a conspiracy were demonstrated, the plaintiff has not shown that KAC imposed a restriction that was unreasonable under the antitrust laws.

 The plaintiff's antitrust challenge involves KAC's policy regarding distributors' territories.[16] Assignment of territories to distributors is a non-price vertical[17] restraint and is governed by the rule of reason. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977). KAC's territorial restrictions, according to the plaintiff, are actually vertical price restrictions, or resale price maintenance, and are, therefore, per se illegal.[18] This argument stems from plaintiff's claims that Gilchrist Machinery was subjected to credit restrictions and was denied discounts as a result of selling outside its territory.[19] In *Eastern Scientific Company v. Wild Heerbrugg Instruments, Inc.,* 572 F.2d 883 (1st Cir.1978), the defendant manufacturer

---

13. In 1982, an area sales representative became aware that Gilchrist Machinery and another distributor were bidding on a project in the other dealer's territory. The representative's weekly report stated that he took a "low profile" regarding the transaction. Although KAC may not have been pleased with sales outside a distributor's territory, it appears that such were not grounds for termination.

14. The claims of threats are not supported by employees of Gilchrist Machinery or by depositions or interoffice memoranda of KAC employees.

15. The plaintiff does not dispute KAC's evidence regarding Gilchrist Machinery's financial status.

16. KAC admits that it discourages extraterritorial sales but denies it has a policy absolutely prohibiting them.

17. Vertical restraints are those "imposed by persons or firms further up the chain of distribution of a specific product." *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 790 (5th Cir.1982). Horizontal agreements are among competitors at the same level of distribution. *Transource*

*International, Inc. v. Trinity Industries, Inc.,* 725 F.2d 274, 279 (5th Cir.1984). Although the plaintiff alleges that its competitors are part of the conspiracy, vertical restriction analysis is applicable. "Conspiracies between a manufacturer and its distributors are only treated as horizontal ... when the source of the conspiracy is a combination of the distributors." *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 245 (5th Cir.1978).

18. Such agreements are "conclusively presumed to be illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

19. KAC's proof supports its contention that the credit restrictions and discounts were unrelated to Gilchrist Machinery's sales outside its territory. Gilchrist Machinery's poor credit record and its own admission of undercapitalization point to the conclusion that the restrictions were necessary to protect KAC's position and were not imposed in furtherance of any anticompetitive conspiracy.

prohibited sales outside the distributor's territory at less than list price. This policy, like the alleged restriction before this court, was a territorial restraint which potentially affected the price at which goods were sold. The court stated:

> It may be true that defendant's policies here appear in *form* to resemble resale price maintenance agreements. However, we are unable to conceive of how the resale restrictions used to enforce the assigned territories in the present case can possibly have a greater anticompetitive *effect* than a pure policy of territorial restrictions."

*Id.* at 885 (emphasis original).

Relying on "demonstrable economic effect," *see Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977), the court found the agreement to be a vertical nonprice restraint governed by the rule of reason. While KAC's alleged restriction differs somewhat from those imposed by Wild, the First Circuit's reasoning is applicable. Therefore, the rule of reason governs the analysis of KAC's alleged restraint.

■ Under the rule of reason analysis, a restraint is unreasonable, and therefore violative of the Sherman Act, if it adversely affects competition. *Hood v. Tenneco Texas Life Insurance Company*, 739 F.2d 1012, 1018 (5th Cir.1984). "The anticompetitive evils of a restrictive practice must be balanced against any procompetitive benefit or justification within the confines of the relevant market." *Hornsby Oil Company, Inc. v. Champion Sparkplug Company*, 714 F.2d 1384, 1392 (5th Cir.1983). The focus of the court's review is primarily interbrand rather than intrabrand competition.[20] Vigorous interbrand competition provides a "significant check on the exploitation of intrabrand

market power because of the ability of consumers to substitute a different brand of the same product." *Continental T.V.*, 433 U.S. at 53 n. 19, 97 S.Ct. at 2559 n. 19.

It is undisputed that KAC controls only a small share of the heavy equipment market, and, consequently, there it little intrabrand competition. KAC's actions discourage, but do not totally impair, intrabrand competition. The evidence shows that Gilchrist Machinery successfully bid on projects outside its territory even when it was subject to the alleged restraints.

■ Territorial restrictions promote interbrand competition by allowing KAC the advantages of more efficient distribution. It can better concentrate its efforts to compete against manufacturers that have established reputations and larger market shares. KAC has made plans for Gilchrist Machinery's replacements to begin business immediately upon cancellation, so interbrand competition will not suffer even temporarily. The plaintiff argues that the company will be terminated as a dealer for its other heavy equipment lines. Consequently, those lines would not be represented in the market and interbrand competition would suffer. The evidence simply does not demonstrate that the other manufacturers will terminate Gilchrist Machinery's franchise as a result of KAC's cancellation. The alleged restraint promotes interbrand competition, does not unduly impair intrabrand competition and, therefore, is not unreasonable under the rule of reason analysis.

■ The plaintiff also contends that it has a substantial likelihood of success on other claims involving interpretation of the franchise agreement. The agreement states that California law will apply in construing the contract.[21] Choice of law provisions are enforceable if the chosen forum

**20.** "Interbrand competition is the competition among manufacturers of the same generic product ... and is the primary concern of antitrust law... In contrast, intrabrand competition is the competition between distributors—wholesale or retail—of the product of a particular

manufacturer." *Continental T.V.*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2559 n. 19.

**21.** "This agreement and all of its terms and conditions shall be governed, construed, and enforced in accordance with the laws of the State of California."

bears some relation to the agreement. *See FMC Finance Corp. v. Murphree*, 632 F.2d 413, 318 (5th Cir.1980). KAC's headquarters are located in California and the agreement was signed on behalf of the company there. Accordingly, the provision is enforceable and this court will look to California law in interpreting the agreement.

The California Franchise Relations Act prohibits the use of a clause allowing termination of a franchisee without cause. *See* Cal.Bus. & Prof.Code § 20000 *et seq.* (West Supp.1984). Because the KAC agreement includes such a provision, the plaintiff argues that it violates the Act.[22] The California Franchise Relations Act is applicable only to franchises "where either the franchisee is domiciled in this state or the franchised business is or has been operated in the state." Cal.Bus. & Prof.Code § 20015 (West Supp.1984). For the reason that Gilchrist Machinery is not domiciled or operated in California, the California Franchise Relations Act, by its own terms, does not apply. *See Bunch v. Artec International Corp.*, 559 F.Supp. 961, 968 n. 14 (S.D.N.Y.1983).

The plaintiff also argues that the agreement is an unenforceable adhesion contract. Under California law, a contract of adhesion is "a standardized contract, which imposed and drafted by the party of superior bargaining strength, reallocates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165, 171 (1981) (quoting *Neal v. State Farm Insurance Companies*, 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781 (1961). It appears that the KAC agreement is an adhesion contract under this definition but, in the absence of other factors, such a contract is fully enforceable. In *Graham,* the court stated that a provision which does not fall within the reasonable expectations of the weaker party or that is unduly oppressive or unconscionable can be invalida-

ted. The *Graham* court found that the contract, a standard musician union contract which included an arbitration clause, was not contrary to the reasonable expectations of Mr. Graham. The court noted that Graham had been a party to many such contracts and concluded that he was aware that all of the disputes arising thereunder were to be resolved by arbitration. For the same reasons, the franchise agreement before this court was not contrary to the reasonable expectations of Bob Gilchrist. He has been involved in several franchise agreements in the heavy equipment industry and reasonably should be knowledgeable about the standard termination clause. This court also concludes that the agreement was not unduly oppressive or unconscionable. Either party could terminate the agreement without cause upon ninety days' notice, and the termination provision is merely a reasonable allocation of risk and is not oppressive to either party.

The plaintiff also alleges that defendant has breached a fiduciary duty to deal in good faith which arose by operation of law. The plaintiff's reliance on Fifth Circuit cases finding such a duty is misplaced, for a determination of whether a duty arises by operation of law from a contract is surely interpretation of that contract and California law, by agreement of the parties, is applicable. Under California law, no fiduciary duty or implied covenant of good faith prevents termination without cause. *See Rickel v. Schwinn Bicycle Co.*, 144 Cal.App. 648, 192 Cal.Rptr. 732, 736 (1983).

The plaintiff finally alleges that KAC fraudulently induced Gilchrist Machinery to sign the agreement by promising that it would remain a distributor as long as its performance was satisfactory. According to the plaintiff, KAC had no intention of performing this promise. The KAC employees who allegedly made such promises left KAC's employ soon after Gilchrist

---

**22.** The plaintiff also argues that the agreement violates the Act in not providing the franchisee

with an opportunity to cure.

1202

Machinery became a dealer and, therefore, had nothing to do with Gilchrist's termination. Furthermore, it is not reasonable to infer from the alleged oral promises an intent to terminate Gilchrist almost seven years later.

In addition, the plaintiff's fraudulent inducement claim is barred by the statute of frauds. In *Caplan v. Roberts*, 506 F.2d 1039, 1041 (9th Cir.1974), the Ninth Circuit, applying California law, stated: "A buyer cannot recover from a seller for fraud on the ground that the oral promise was made without the intention of performing it." To do so would nullify the statute of frauds. The plaintiff's claim is also barred by the parole evidence rule. Fraud is an exception to the parole evidence rule but, under California law, that exception does not make admissible a promise directly at variance with the promise of the writing. *See Mobile Oil Corp. v. Handley*, 76 Cal. App.3d 956, 143 Cal.Rptr. 321, 324–25 (1975).

The court's conclusion that the plaintiff has not established a likelihood of success on the merits of its claims is based on the evidence presented at the hearing. A preliminary injunction hearing is necessarily abbreviated, so the court does not foreclose the possibility that, at a trial on the merits, the plaintiff could present more extensive proof and ultimately prevail.

### IRREPARABLE INJURY TO THE PLAINTIFF

■ The plaintiff must show that it will suffer irreparable harm absent the issuance of the preliminary injunction. Incorporated into this requirement is the necessity of showing an inadequate remedy of law. *See Fox Valley Harvestore v. A.O. Smith Harvestore Products*, 545 F.2d 1096, 1098 (7th Cir.1976).

In *Roland Machinery Company v. Dresser Industries, Inc.*, 1984–2 Trade Cases, ¶ 66,627 (7th Cir.1984), the Seventh Circuit reversed the district court's issuance of a preliminary injunction. In this case the plaintiff sought the preliminary injunction to prevent termination of its franchise by the defendant. The court stated:

> The absence of an adequate remedy at law is a precondition to any form of equitable relief. The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief ... Only if he will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction.

*Id.* at 66,626.

The *Roland* court set out four ways in which an award of damages at the conclusion of a trial can be an insufficient remedy.

> (a) The damage award may come too late to save the plaintiff's business...
>
> (b) The plaintiff may not be able to finance his lawsuit against the defendant without the revenues of his business ...
>
> (c) Damages may be unobtainable from the defendant because he may become insolvent ...
>
> (d) The nature of the plaintiff's loss may make damages very difficult to calculate ...

*Id.*

■ The plaintiff argues that Gilchrist Machinery will be forced out of business if KAC is permitted to exercise the termination clause. Should this happen, monetary damages would be available if the plaintiff prevails at a trial on the merits. In *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197 (2nd Cir.1970), the plaintiff sought to enjoin the defendants from terminating the dealership. The court stated: "The right to continue a business in which William Semmes had engaged for twenty years and to which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award." *Id.* at

1205. Likewise, the Gilchrists want to sell heavy equipment.[23] The court is not convinced, however, that termination of the franchise will force Gilchrist Machinery to close its doors.

In *Roland,* the court found that approximately one-half of the distributor's income was attributable to the sale of Dresser products. Only 10%, however, was from sales of new Dresser equipment. The court concluded that rental revenues would not be affected by termination. Roland's profit from service and the sale of parts would be decreased to the extent that they could no longer be purchased at the discount price available to dealers. Because Roland's primary profit in its service department was derived from labor charges, the court considered the effect inconsequential. The court also found that Roland could continue in business by improving its sales performance in other lines of equipment. *Roland,* 1984.2 Trade Cases at 66,-630.

At present, KAC-related transactions account for 50% to 60% of Gilchrist Machinery's business, according to the plaintiff. Termination of the franchise, however, would not affect all of those transactions. Gilchrist Machinery would, of course, not be able to sell new machines as an authorized dealer but could continue its rental operations and sale of used machines. At the hearing, a contractor called by the plaintiff testified that, when renting, he was primarily influenced by the availability and condition of the appropriate machine and by the reliability of the renter. By its own admission, Gilchrist Machinery's rental fleet is one of the largest in the state and is also in excellent condition. Therefore, its present stock should be sufficient to last at least until a hearing on the merits is held. The plaintiff contends, however, that customers prefer to deal with the distributor and would not rent from Gilchrist Machinery if it were not a KAC dealer. This contention is not supported by the testimony of the contractor that he would continue to rent from Gilchrist Machinery, which should, furthermore, be able to provide service just as it did as a dealer. KAC has agreed to make parts available to Gilchrist at the ordinary dealer's discount price if the preliminary injunction is not granted. Therefore, Gilchrist Machinery will not experience a loss in profits in providing parts and service.

The plaintiff argues that its business will decease so greatly that it will be required to layoff 20 to 25 members of its experienced staff[24] and that the few employees remaining would be insufficient to provide quality service. In addition, according to the plaintiff, the staff could not be reassembled if Gilchrist Machinery prevails on the merits at trial. Only a small percentage of Gilchrist Machinery business will be directly affected by the termination.[25] In addition, Gilchrist Machinery, like Roland Machinery Company, could increase its efforts to market its other lines of equipment. Plaintiff will, of course, be required to alter certain business practices to adjust to the change. As the *Roland* court stated, "In sum, the loss of the ... distributor-

23. The court notes that Gilchrist Machinery has made several attempts since 1980 to sell its business. Furthermore, after receipt of the termination letter, Gilchrist wrote KAC regarding the sale of its facilities to the replacement dealer.

The majority of machines sold by Gilchrist Machinery since January 1984, have been from the company's rental fleet. Therefore, termination of the franchise will not impair these continued sales.

24. The alleged decrease, according to the plaintiff, would in part be caused by the termination of Gilchrist Machinery as the distributor for other manufacturers of heavy equipment. The evidence does not show that Gilchrist Machinery would indeed be cancelled as a result of its termination by KAC.

25. The plaintiff also alleges that it will lose the reputation and goodwill established during the term of its franchise. Goodwill and reputation are based on a dealer's ability to delivery reliable and courteous service. Consequently, Gilchrist Machinery should be abie to uphold its reputation .even if the franchise is terminated since the court determines that the company will not be forced out of business by the termination.

ship will be painful, but it will not be fatal."

The plaintiff also argues that termination of its franchise will deprive it of the funds necessary to continue this litigation. The plaintiff's attorneys are being paid on an hourly rather than contingent fee basis and, accordingly, funds must be continually available for payments. The court is not convinced by the plaintiff's argument. Additionally, it appears that Bob Gilchrist has sufficient funds available from his personal resources and from members of his family who have taken part in the operation of the business.

The *Roland* court stated that damages may be inadequate if the defendant may become insolvent before trial. The plaintiff offered nothing to question KAC's ability to pay a judgment. Accordingly, the court cannot find that damages would be inadequate on this basis.

The plaintiff further charges that the calculation of damages after success at a trial will be speculative and difficult to calculate. Courts have regularly granted specific damage amounts for lost profits. Additionally, the plaintiff submitted the report of its accountant calculating losses for the next ten years should Gilchrist Machinery be terminated. This report apparently takes into account all of the losses anticipated by the plaintiff from the loss of the franchise.

## HARM TO THE DEFENDANT

■ The plaintiff must furthermore show that the harm that it will suffer without the preliminary injunction outweighs that incurred by the defendant if the preliminary injunction should be granted. It appears that KAC's ability to sell its product in Gilchrist Machinery's territory will be hampered by the retention of its present franchisee. As shown by its past performance, Gilchrist Machinery does not satisfy the requirements seen by KAC as necessary for the effective marketing of its products. KAC interprets its success as dependent on sales of new machines and Gilchrist Machinery has not performed satisfactorily in this area. In addition, the relationship between KAC and Gilchrist Machinery, which has apparently been strained for some time, has become even more tenuous throughout this litigation. Employees fear that statements made in the ordinary course of business could be misconstrued and used against an employer. The evidence shows that both parties have at times tape recorded conversations with the opposing party. Friends of Bob Gilchrist, masquerading as potential customers, approached Doug Nunnery of WWW in an effort to solicit incriminating statements. KAC has produced evidence showing that the attitude of Bob Gilchrist makes the possibility of good working relations faint. At the hearing, Gilchrist stated that he ignored advice from one high-ranking KAC officer whom he considered to be the "company drunk." Gilchrist also stated that he refused to submit monthly inventory reports, required of each dealer pursuant to the franchise agreement, for fear that KAC would report names of prospective customers to competing KAC distributors. These reports are necessary to enable KAC to plan its inventory needs. In addition, KAC has given benefits to Gilchrist Machinery that are unavailable to other distributors to avoid further allegations of mistreatment. This is not an atmosphere in which business can effectively be conducted.[26]

Furthermore, if the preliminary injunction is issued, KAC will be unable to appoint a replacement dealer for the territory

---

**26.** The defendant contends that the court would be called on during the course of a preliminary injunction to mediate differences between the parties. The plaintiff points out that this has not been necessary during the past eight months when the agreed order has been in effect. KAC has stated, however, that it will discontinue the special treatment given to Gilchrist Machinery during the term of the agreed order. Because of this, the court would anticipate requests for court intervention from both parties should the preliminary injunction issue. While this is not a controlling factor in its decision, the court notes that it is not competent to operate a heavy equipment franchise.

which it considers will adequately serve the area. Continued service of the territory by an ineffective distributor causes KAC to lose sales which can never be recovered. This court hesitates to freeze KAC "into an intimate and continuous relationship with a dealer it no longer wishes to be associated with." *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2nd Cir.1979). At the hearing, counsel for KAC announced that it has selected Gilchrist Machinery's replacements. Those dealers can, therefore, begin immediately to market products in the way KAC deems to be more effective.

## PUBLIC POLICY

In enacting the anti-trust laws, Congress has declared that the public interest is best served by encouraging competition. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 300, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). While the issuance of a preliminary injunction will protect Gilchrist Machinery, the competitor, it will not necessarily promote competition. It is reasonable to conclude that competition will be furthered by allowing KAC to terminate its agreement with Gilchrist Machinery and obtain an aggressive and effective distributor for that territory.

The court concludes that the plaintiff has not satisfied the requirements of the *Canal Authority* test.

It is, therefore, ordered that plaintiff's motion for preliminary injunction is denied.