**L.J. DREILING MOTOR COMPANY, Plaintiff,**

v.

**PEUGEOT MOTORS OF AMERICA, INC., et al., Defendants.**

Civ. A. No. 81–C–911.

United States District Court, D. Colorado.

Jan. 8, 1985.

See also 539 F.Supp. 402.

Richard B. Podoll, Podoll & Podoll, P.C. and Hugh A. Burns, Burns & Figa, P.C., Denver, Colo., for plaintiff L.J. Dreiling Motor Co.

Philip E. Johnson, Mosley, Wells & Johnson, P.C., Denver, Colo., for defendant Peugeot Motors of America, Inc.

John B. Moorhead, Baker & Hostetler, Denver, Colo., for defendant Chrysler Corp.

## MEMORANDUM OPINION
## AND ORDER

CARRIGAN, District Judge.

This action was commenced by the L.J. Dreiling Motor Company, Inc. ("Dreiling") against the Peugeot Corporate Family ("Peugeot")[1] and Chrysler Corporation ("Chrysler") for damages allegedly resulting from Dreiling's termination as a Peugeot franchisee. The original complaint, filed June 5, 1981, has gone through several transformations. The Fourth Verified Amended Complaint (hereafter "Complaint"), filed February 17, 1983, is currently at issue. In this Complaint, the plaintiff asserts four claims for relief: 1) contracts, combinations or conspiracies among the defendants unreasonably restraining trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; 2) an unlawful merger and acquisition between Chrysler and Peugeot, S.A. ("PSA") in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and section 7 of the Clayton Act, 15 U.S.C. § 18; 3) breach of contract by Peugeot Motors of America, Inc. ("PMA"); and 4) interference with contractual relations by Chrysler.

PMA has moved for summary judgment on the three claims asserted against it.[2] Chrysler has moved for judgment on the pleadings or, in the alternative, for summary judgment on the three claims asserted against it. Dreiling has moved for partial summary judgment on the issue whether the conduct of Lou Bartlett, a former employee, can be imputed to it; this issue relates to the breach of contract claim.

Following extensive discovery, the parties filed comprehensive briefs and presented their respective positions through oral argument.

### 1. *Facts and Claims.*

The L.J. Dreiling Motor Company was an authorized Peugeot dealership from May 1975 to June 1981. In 1981, the company also operated Renault and International Harvester dealerships. Peugeot Motors of America terminated the franchise on the asserted ground that Dreiling had submitted approximately $32,000 worth of fraudulent warranty claims in violation of the dealership agreement. Dreiling admits that its service manager, Lou Bartlett, submitted these claims but denies that Lloyd J. Dreiling, its president, or Steven J. Dreiling, its secretary-treasurer, had knowledge of or participated in submitting them.

In 1978, Chrysler acquired fifteen percent of PSA's stock. On February 5, 1980, Chrysler and Peugeot executed a "Memorandum of Intent" providing for industrial cooperation in the development and manufacture of a new small car, commercial cooperation in the distribution of Peugeots in the United States and Canada, and a short term loan of $100,000,000 to Chrysler Corporation. On May 30, 1980, Chrysler and Peugeot entered into an Agreement formalizing and elaborating upon certain aspects of the Memorandum of Intent. Chrysler agreed to furnish consulting services and market representation assistance to Peugeot in furtherance of Peugeot's goal to expand its sales in the United States market. Chrysler also indicated a willingness to assist Peugeot in various functional aspects of importation and distribution of Peugeot products and to furnish technical, engineering and design assistance to Peugeot. These matters, however, were subject to further negotiation and subsequent agreements. Peugeot agreed

---

1. The Peugeot corporate family consists of Peugeot, S.A. ("PSA"), a French corporation; Automobiles Peugeot ("AP"), a French corporation; and Peugeot Motors of America, Inc. ("PMA"), a Delaware corporation. PSA owns 100% of AP. PSA owns 10% of PMA and AP owns the remaining 90%. Chrysler owns 15% of PSA.

2. AP and PSA did not join in the motion for summary judgment. They have moved to dismiss for lack of personal jurisdiction.

to pay Chrysler, for its consulting services, an annual fee of $300,000 plus five percent of the net dealer invoice price of each vehicle sold by Peugeot to Chrysler dealers who would become Peugeot dealers during the term of the agreement.

Dreiling asserts that its termination as a Peugeot franchisee on June 21, 1981 was part of a nationwide scheme between Peugeot and Chrysler systematically to terminate existing Peugeot dealers and replace them with Chrysler dealers. Dreiling asserts that this scheme was effectuated in its particular case by PMA's creation of a pretext for termination. According to Dreiling, PMA either engineered, or participated in, submission of the fraudulent warranty claims upon which PMA based its termination of Dreiling's dealership.

PMA, on the other hand, asserts that it lawfully terminated Dreiling because Dreiling had breached its dealership agreement by submitting the fraudulent warranty claims. Peugeot and Chrysler admit that Chrysler agreed to assist Peugeot to expand its sales in the United States market through Chrysler's dealer network. They assert, however, that neither the purpose nor the effect of the agreement was the systematic replacement of existing Peugeot dealers with Chrysler-Peugeot dealers. Rather, Peugeot was to evaluate existing Peugeot dealers on a dealer by dealer basis and similarly evaluate Chrysler dealers recommended by Chrysler for Peugeot franchises. Chrysler denies that it played any part in Dreiling's termination.

2. *Propriety of Summary Judgment in Antitrust Litigation.*

In *Perington Wholesale, Inc. v. Burger King Corp.*, 554 F.Supp. 708, 710 (D.Colo. 1982), Judge Matsch addressed the propriety of summary judgment in antitrust litigation:

"It is axiomatic that summary judgments in antitrust litigation are to be used sparingly and are seldom justified .... However, 'the mere allegations of a contract, a combination, or a conspiracy, for the purpose of restraining trade or commerce, and resulting damages, once rebutted, will not withstand summary judgment.' ... Where the court has permitted extensive discovery, and where the requirements of Rule 56 are satisfied, the court may properly grant the motion in an antitrust setting .... 'Indeed, the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust laws often encompass a great deal of expensive and time consuming discovery and trial work, but also ... the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation .... If a trial would serve no useful purpose, summary judgment is proper.'" (citations omitted)

Discovery has been extensive. Plaintiffs served hundreds of written interrogatories and requests for production of documents on Peugeot. Seventeen depositions have been taken, ten by Dreiling and seven by Peugeot. At the preliminary injunction hearing on June 26, 1981, ten witnesses testified for about six hours. Numerous affidavits and exhibits have been submitted by both sides in support of various motions. While one would not measure the worth of the Mona Lisa by the weight of the paint, it merits notice that the court file in this case is approximately fifteen inches thick, and this does not include most of the documents produced by discovery.

On May 4, 1983, Peugeot moved for a protective order staying further discovery, in particular the plaintiff's third request for production of documents and twelve noticed depositions of persons at the national levels of Chrysler and Peugeot, including the president of Chrysler Corporation, the president of Peugeot Motors of America, the president of Peugeot, S.A., and the chairman of the board of Peugeot, S.A. The motion for protective order was granted pending resolution of the summary judgment motions. All of the proposed discovery appears to have been directed to elucidation of the scope and contours of the alleged agreement between Chrysler and Peugeot to replace existing Peugeot deal-

ers with Chrysler dealers. Virtually all of the discovery so far completed concerns this issue. Although Dreiling had not yet conducted any analysis of the alleged agreement's effect on competition, none of the additional proposed discovery appears to be directed to that issue.[3]

As will be demonstrated below, the plaintiff's antitrust claims ultimately must fail because it has not shown, nor even attempted to show, that the alleged agreement has affected competition in a way that constitutes an unreasonable restraint of trade or tends to create a monopoly. I conclude, therefore, as a preliminary matter, that the discovery completed to date has been extensive and that Dreiling is not significantly prejudiced by the decision of these summary judgment motions before completion of the additional proposed discovery. Thus it is appropriate to consider the merits of the summary judgment motions.

3. *Section 1 of the Sherman Act.*

■ Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." Peugeot and Chrysler undeniably entered into an agreement, though the scope of the agreement is in dispute. Obviously, an agreement alone does not violate the Sherman Act. Section 1 of the Sherman Act is violated only if the purpose or effect of the agreement is to restrain trade.

■ A restraint of trade is either *per se* illegal or is to be judged under the rule of reason. The Supreme Court explained in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977):

"Since the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing standard of analysis. *Stan-*

*dard Oil Co. v. United States*, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619] (1911). Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. As the Court explained in *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 [78 S.Ct. 514, 518, 2 L.Ed.2d 545] (1958), 'there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'"

■ *Per se* violations are generally recognized to be limited to price fixing, horizontal market division and group boycotts. *See* L. Sullivan, *Handbook of the Law of Antitrust* §§ 70–92 (1977). Neither price fixing nor group boycott has been alleged here. Although Dreiling never has explicitly asserted that the defendants' conduct is a *per se* violation of the Sherman Act, the allegations in Paragraph 24 of the Complaint could be construed as claiming horizontal market division. Paragraph 24 alleges:

"Chrysler Corporation agreed with the other Defendants to divide the geographical market of the United States such that each would be free of competition from the other within this market in the models of the new small car. Chrysler Corporation further agreed not to manufacture and distribute EIRs [Expensive Import Registrations] or automobiles competitive with EIRs in order to avoid competing with the Peugeot corporate family."

**3.** Plaintiff's third request for production of documents to Peugeot requests the personnel files of six PMA employees; documentation relating to the May 30, 1980 Memorandum of Intent [sic]; documentation relating to the decision by Peugeot and Chrysler to abort plans for joint

production of a sub-compact car for the U.S. market; documentation relating to the consideration of six Dodge dealers as potential Peugeot dealers; and documents in Peugeot's possession submitted by Chrysler to the Chrysler Corporation Loan Guarantee Board.

The basis for this allegation is not stated, but it can be inferred from the fact that paragraphs 21 to 23 of the complaint relate to the February 5, 1980 Memorandum of Intent and Paragraphs 25 to 31 refer to the May 30, 1980 Agreement, that Paragraph 24 is based on one or both of those documents. I have searched in vain the Memorandum of Intent and Agreement, as well as all the other evidence presented in this case, for an agreement to divide the geographical market of the United States. This allegation simply has no evidentiary foundation. Dreiling's allegation of Chrysler's agreement not to manufacture competing automobiles is similarly unfathomable. Dreiling's only support for this latter allegation is the following language from the preamble to the May 30, 1980 Agreement:

> "Whereas CC [Chrysler Corporation] has determined that, in the light of the distinct character of the EIR market, the distribution of Peugeot Vehicles via a selected number of CC dealers as herein contemplated will not be competitive with the distribution via these same dealers of the vehicles which CC currently distributed or plans to distribute during the term of this Agreement but will, in fact, strengthen these dealers to the benefit of CC and said dealers; ...."

But this is no *agreement* not to compete; rather, it is a statement of the *fact* that Chrysler and Peugeot did not then compete.

Furthermore, Dreiling's alleged injury, its termination as a Peugeot franchisee, could not have been caused by these alleged horizontal market division aspects of the agreement between Chrysler and Peugeot. Chrysler and Peugeot declared in the Memorandum of Intent that they intended "to cooperate in the joint development and manufacture of a small passenger car and in the joint study of a light commercial vehicle." The May 30, 1980 Agreement did not, however, formalize this industrial cooperation aspect of the Memorandum of Intent. In June 1981 when Dreiling was terminated, the proposal was still in an exploratory phase and, indeed, was ultimately abandoned. Even if the proposed small passenger car had been manufactured, I fail to see, nor has Dreiling suggested, how its distribution would have resulted in termination of existing Peugeot dealers. Indeed, an allegation of geographical market division logically implies the opposite. If all Peugeot vehicles were to be marketed through Chrysler dealers, as Dreiling alleges, there would be no need to divide the market.

The same lack of any apparent causal connection is evident regarding Chrysler's alleged agreement not to manufacture a competing automobile. Dreiling sold Peugeot vehicles. Any agreement by Chrysler not to manufacture a competing automobile could only have benefitted a Peugeot dealership.

Whether because of lack of standing, or because of inability to prove damages resulting from the alleged horizontal market division aspects of the agreement,[4] it is clear that Dreiling cannot effectively challenge the aspects of the agreement alleged in Paragraph 24 of the Complaint, and I so conclude.

Dreiling's injury, if any, arises from the commercial cooperation aspect of the agreement. Pursuant to this aspect, Dreiling alleges existing Peugeot dealers were to be terminated and replaced with Chrysler-Peugeot dealers. Assuming, *arguendo*, that the allegation is true, should the agreement be treated as a relatively benign "vertical" restraint, subject to the rule of reason, or as a "horizontal" restraint, potentially subject to *per se* illegality? "It is important to distinguish between 'horizontal' restraints, *i.e.* agreements between competitors at the same level of the market structure, and 'vertical' restraints, *i.e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors." *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.1978). The American Bar Association

---

**4.** *See* P. Areeda, *Antitrust Analysis,* para. 160(b)   at p. 81 (3d ed. 1981).

Antitrust Section addressed this issue in its Monograph No. 9, *Refusals to Deal and Exclusive Distributorships* (1983), p. 21:

"The law is settled that where competitors at one level of distribution agree not to deal with a customer or supplier, the refusal to deal will be considered horizontal. The law is equally settled that where a firm operating at one level of distribution unilaterally decides to refuse to deal with a firm operating at another level of distribution, and the two firms engage in no competition at the same level, the refusal will be considered vertical. There exists a substantial gray area between these two situations, however, where it can be disturbingly difficult to determine whether a refusal should be treated as horizontal or vertical."

This case falls into the gray area. It is not in the class of "classic boycotts" referred to in the first sentence. First, it is not clear that Chrysler and Peugeot are competitors in the relevant product market, the EIR market. *See* Complaint para. 17. Second, the agreement only involved two of the many automobile manufacturers who sell in the United States market. On the other hand, because of Chrysler's alleged involvement, there is potentially more than the unilateral refusal to deal referred to in the second sentence of the paragraph quoted above.

One type of case in this gray area is the exclusive distributorship. Peugeot's alleged conduct is analogous to the grant of an exclusive distributorship to Chrysler dealers. Exclusive distributorships usually are subject to the rule of reason, but there has been support for the proposition that they should be classified as *per se* lawful. Posner, "The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality," 48 U.Chi.L.Rev. 6 (1981). The ABA Antitrust Section explained in its Monograph No. 9, *supra,* pp. 26–27:

"The validity of an exclusive distribution system typically is called into question by a terminated or about-to-be-termi-

nated distributor, which itself may have had an exclusive distributorship, and which may have been eliminated in order to grant another distributor an exclusive distributorship, or which may have been eliminated in order to allow the manufacturer to integrate vertically. It has been argued, with repeated success, that the substitution of one exclusive distributor for another should be lawful on the ground that the antitrust laws serve to protect competition, not competitors, and that such substitution does not reduce the number of distributors competing. In *Ace Beer Distributors, Inc. v. Kohn, Inc.,* [318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922 [84 S.Ct. 267, 11 L.Ed.2d 166] (1963)] for example, where one distributor was being replaced by another, the defendant successfully moved for summary judgment on the ground that even if a conspiracy existed, 'the object to be achieved was not one rendered obnoxious by the Sherman Act.'

The substitution of one distributor for another in a competitive market of the kind herein involved does not eliminate or materially diminish the existing competition of distributors of other beers, is not an unusual business procedure, and, in our opinion, is not an unreasonable restraint of trade.

Similarly, in *Burdett Sound, Inc. v. Altec Corp.,* [515 F.2d 1245 (5th Cir.1975)] the court stated:

Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business."

█ More exacting scrutiny may perhaps be warranted when the new distributors have vertical ties to another manufacturer.[5] But the usual characterization of

---

**5.** It must be noted that Chrysler does not *own* its dealers. The dealers are independent businesses operating under franchise agreements with Chrysler.

horizontal restraints as "naked restraints of trade with no purpose except stifling competition," is inapposite to the alleged agreement.[6] *See White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). The agreement between Chrysler and Peugeot is a hybrid, having both a vertical component and a horizontal component. Given the admonition that *"[p]er se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive," *Continental T.V., Inc. v. GTE Sylvania Inc., supra,* 433 U.S. at 49–50, 97 S.Ct. at 2557, I conclude that the agreement must be judged under the rule of reason.

The inquiry, then, is whether the defendants' conduct unreasonably restrained trade or commerce in the relevant product market. Accordingly, one would have to determine at a minimum whether Chrysler's and Peugeot's products compete in the same product market and, if they do, the market power of the two manufacturers. Plaintiff has identified the relevant product market as the purchase and sale of expensive imported automobiles ("Expensive Import Registrations" or "EIRs") in Colorado and the United States. Complaint para. 17. Plaintiff, however, has not presented any evidence showing that Chrysler and Peugeot compete in this, or any other, market. As for market power, Dreiling merely recites that Chrysler Corporation is the world's third largest automobile manufacturer and that Peugeot is the world's sixth or seventh largest automobile manufacturer.[7] Complaint paras. 19 and 20. This information, without more, is meaningless. Dreiling has not presented to this court even the most basic market representation data. Colorado and the United States are the relevant geographical markets, not the world. Nor does Dreiling state Peugeot and Chrysler's percentage representation in the EIR market (or explain why some other market is the relevant product market).

After four amended complaints, two years of discovery, and innumerable motions, the plaintiff has not demonstrated even an inkling of understanding that it must produce such an analysis to support its antitrust claim. This deficiency alone warrants the grant of summary judgment to defendants on Dreiling's claim under section 1 of the Sherman Act.

Dreiling did submit an April 11, 1983 "Memorandum on Behalf of Chrysler Corporation Concerning the Proposed General Motors-Toyota Joint Venture," prepared for Chrysler by the law firm of Dewey, Ballantine, Bushby, Palmer & Wood, ostensibly in support of its Sherman Act claim. Although this analysis is not relevant because it relates to the industrial cooperation aspect of the agreement, rather than the alleged commercial cooperation aspect which allegedly led to Dreiling's termination, I will review the memorandum here since it is the only market analysis presented by Dreiling.

The memorandum asserts that a GM-Toyota proposal for joint production of a subcompact passenger car for sale in the United States violates section 1 of the Sherman Act. Dreiling argues that the same conclusion must be reached regarding the Chrysler-Peugeot joint venture. I need not decide the correctness of the memorandum's analysis because the analysis, whether or not correct, does not support Dreiling's claim that a Chrysler-Peugeot

---

**6.** The agreement between Chrysler and Peugeot may very well aid competition. If Chrysler does not compete in the EIR market as it asserts, there can be no restraint on competition between Chrysler and Peugeot. Any market assistance Chrysler could give Peugeot would aid Peugeot to compete more successfully with other manufacturers in the EIR market, such as Audi, Volvo, Mercedes-Benz and BMW.

**7.** In its Complaint Dreiling states that Peugeot is the *sixth* largest automobile manufacturer while in its supplemental memorandum brief in opposition to Chrysler's motion for summary judg-

joint venture violates section 1 of the Sherman Act.[8]

The memorandum argues that, in the case of horizontal joint ventures, antitrust concerns are raised "whenever the parents account for more than a 15% share of a concentrated market." Memorandum, p. 11. The appendix lists the following market share data.

"1982 Model Year Market Share Data

|  | Subcompacts | All Cars |
|---|---|---|
| General Motors | 21.7 | 44.1 |
| Ford | 17.5 | 16.8 |
| Chrysler | 7.1 | 10.0 |
| Toyota | 13.7 | 6.7 |
| Nissan | 9.7 | 5.9 |
| Honda | 13.1 | 4.6 |
| Volkswagen | 5.8 | 2.1 |
| Mazda | 2.2 | 2.0 |
| Subaru | 5.8 | 1.8 |
| AMC | 1.5 | 1.3 |
| Others | 1.9 | 4.7" |

While General Motors in 1982 enjoyed 21.7% of the United States market for subcompacts and 44.1% of the market for all cars, Chrysler accounted for only 7.1% and 10.0% respectively. It can be inferred from this list that Peugeot enjoyed less than 1.5% of the United States market for subcompacts and less than 1.3% of the market for all cars. This contrasts to Toyota's 13.7% share of subcompacts and 6.7% share of all cars. Assuming for the sake of argument that Peugeot singlehandedly accounted for the entire 1.9% of "other" subcompacts and 4.7% of all other cars, the Chrysler-Peugeot combined market share would still be only 9.0% of the subcompact market and 14.7% of the "all cars" market. The 15% threshold of concern is not reached in either market.

The foregoing discussion has assumed that Chrysler and Peugeot did in fact agree systematically to terminate existing Peugeot dealers and replace them with Chrysler dealers. I turn now to an evaluation of the evidence presented in support of and in opposition to that allegation.

Dreiling conclusorily asserts that the intent and effect of the February 5, 1980 Memorandum of Intent and the May 30, 1980 Agreement were to diminish or eliminate competition between Chrysler and Peugeot. Complaint paras. 22 and 26. Based on letters and memoranda submitted as exhibits to the Complaint, Dreiling further asserts that Chrysler and Peugeot commenced an active campaign to recruit Chrysler dealers to accept Peugeot franchises and to terminate existing Peugeot dealers in furtherance of the May 30, 1980 Agreement. Complaint paras. 29 and 30.

While I must construe all facts in the light most favorable to the plaintiff, the party opposing these summary judgment motions, I am not required to accept as true the conclusions drawn by the plaintiff from these facts. Upon review of all the evidence submitted by the parties, I find neither an anticompetitive intent nor an anticompetitive effect resulting from the agreement between Chrysler and Peugeot. None of the evidence Dreiling relies upon supports this allegation. Indeed, Dreiling's own evidence leads to the conclusion that Peugeot intended to review existing dealers' respective performances on a dealer by dealer basis.

The best evidence of Peugeot's and Chrysler's intent is the language of the Memorandum of Intent and subsequent Agreement. The February 5, 1980 Memorandum of Intent provided, in pertinent part, as follows:

*"Commercial Cooperation*

PSA plans, particularly through its subsidiary, Automobiles Peugeot, to expand progressively its products available for export to North America, concentrating in the medium and upper lines of

---

ment Dreiling states that Peugeot is the *seventh* largest automobile manufacturer.

**8.** There is reason to question the memorandum's analysis and conclusion that the joint venture violates the antitrust laws. The Federal Trade Commission subsequently determined that the proposed joint venture does not violate the antitrust laws and declined to exercise its authority under sections 5 and 13 of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 53(b), and section 11 of the Clayton Act, 15 U.S.C. § 21, to issue an administrative complaint and to enjoin GM and Toyota from proceeding with their agreement.

European imported vehicles. To this end, CC [Chrysler Corporation] and PSA intend to establish a commercial cooperation in the United States and Canadian markets. The fundamental objective of this cooperation would be to increase significantly the sale of Peugeot vehicles in these markets over the next few years, so as to attain, on a progressive basis, the levels achieved by Peugeot's principal European competitors in these medium and upper lines of vehicles. This development of Peugeot's sales would facilitate the future introduction of the Peugeot versions of the new small car in North American markets, which is one of the purposes of the industrial cooperation outlined above.

This cooperation would cover in its initial years the following principal areas:

—the preparation of market studies and the development of a plan for the reinforcement and expansion of the dealer networks of Peugeot Motors of America, Inc. and Peugeot Canada Ltd. CC would also aid in the implementation of this plan, particularly by suggesting an appropriate number of CC dealers to join progressively the Peugeot dealer networks so as to increase their sales potential;

* * * "

The May 30, 1980 Agreement provided for the following market representation assistance from Chrysler:

*"Market Representation Assistance*

A. CC agrees to provide market representation assistance to PMA to aid PMA in expanding its dealership network along the following lines:

(i) PMA will periodically advise CC of those United States market areas where an additional dealer or dealers would be desirable and where CC's assistance in dealerization would be helpful ('Open Points').

(ii) CC agrees to evaluate CC dealers in these Open Points to determine whether they are located, equipped and capitalized so as to be viable prospects for the Peugeot franchise and, if so, to recommend such dealers to PMA for consideration. In order to assist CC in its evaluation of prospective Peugeot dealers, PMA will provide CC from time to time with the general criteria it employs in assessing dealer eligibility for a Peugeot franchise. CC further agrees to provide PMA with such general background information on dealers recommended to PMA as PMA may reasonably request, provided such information may be disclosed by CC without violating any provisions of the Direct Dealer Agreement(s) or any other agreement between CC and any such dealers.

(iii) If PMA finds that a dealer prospect recommended by CC for an Open Point meets its criteria (including the location of the dealer prospect) for a prospective Peugeot dealer, PMA will so inform CC. CC will then contact the dealer prospect and consult with the prospect regarding the possibility of taking on the Peugeot franchise. Should the prospect indicate an interest, CC will so advise PMA. PMA may then proceed to offer the CC dealer the Peugeot franchise in accordance with PMA's standard franchising practices.

(iv) The above procedures for the enfranchisement by PMA of a selected number of CC dealers are recognized by both parties to be general guidelines which are susceptible to modification by mutual agreement from time to time in light of experience.

B. Both parties recognize that substantially all of CC's dealers are independent businesses not owned or controlled by CC and that CC cannot require any such dealers to accept the Peugeot franchise. Correspondingly, both parties also recognize that PMA will retain complete discretion in determining whether or not to offer a Peugeot franchise to any CC dealer recommended by CC. After a CC dealer has become a Peugeot dealer, the relationship between the dealer and PMA will be governed by the terms of the Peu-

geot Dealer Agreement and the customary business practices of PMA, and PMA will be solely responsible for assessing the performance of any such dealer under that Dealer Agreement and solely responsible for the termination of any such dealer.

C. PMA shall have sole responsibility for compliance with applicable federal, state and local laws pertaining to the enfranchisement of any CC dealer as a Peugeot dealer or to the termination of any such dealer as a Peugeot dealer.

D. The enfranchisement by PMA of a selected number of CC dealers will not commence until such time as the 505 turbo diesel is available in sufficient volume to provide adequate supplies to all Peugeot dealers, which is currently expected to occur in the last quarter of 1980. However, in light of the importance which both parties attach to the success of the first group of CC dealers taking on the Peugeot franchise, preparatory work towards the selection of and consultation with such dealers will commence promptly following the effective date of this Agreement."

The quoted agreement by no means supports Dreiling's claim of intended wholesale termination of existing Peugeot dealers.

A Peugeot interoffice memorandum, dated February 25, 1980, from Ralph Wilson to Pierre Lemaire, President of PMA, suggested the following market representation plan. Peugeot proposed to increase its sales in the United States to 50,000 cars. It divided the United States into local market areas, called "Areas of Responsibility" or "AORs," and determined the number and percentage of Expensive Import Registrations in each AOR. Peugeot then multiplied the percentage for each AOR times 50,000 to determine the sales objective for each AOR. Assuming that it would need a dealer in every AOR with a sales objective of more than 200 cars, Peugeot determined that it needed 106 additional dealers. The memorandum explained:

"As would be expected, this list of 106 proposed additional sales points would bring us to about the same numerical dealer strength as Audi, Volvo, Mercedes-Benz, and BMW. The resultant dealer network would not give us representation at every point covered by any given competitor, but it would put us into all points where the competition as a group is successfully represented.

Clearly, closing all of the proposed sales points would take several years, and such an expansion of the network should be undertaken only if we are fully committed to high sales goals; premature expansion would lead to high expenses, low sales per dealer, and an even higher rate of dealer turnover.

It should be noted that the market areas covered by this proposed open point list account for only about 17,500 units out of a 50,000 unit sales goal, and then only if we have 100% efficient representation in each of the 106 market areas; therefore it is plain that dealer upgrading or replacement must account for the greater share of sales growth."

Dreiling seizes upon this last clause in the memorandum to support its allegation that Peugeot planned to terminate existing dealers, regardless of their performance, to make way for Chrysler dealers. But the conclusion Dreiling urges on this court is not supported by the memorandum or other evidence. The statement that existing dealers must be upgraded or replaced simply reflects the mathematics of the sales objective.

A March 11, 1980 memorandum from Ralph Wilson to Pierre Lemaire and T. Aldarelli reports that Chrysler agreed with the methodology suggested in the February 25, 1980 memorandum discussed above. The following paragraph is highly probative of Peugeot's intent regarding market representation expansion:

"If we wish to determine what points could *theoretically* be filled by Dodge dealers, we have only to list the Dodge dealers located within the PMA AOR's that show up as open points at the finally

decided sales planning goal. It should be policy, however, to survey each open point individually and establish a ranked list of potential Peugeot dealers and to contact these dealers starting with the highest ranked prospect rather than automatically offering the franchise to a local Dodge dealer." (emphasis in original)

Dreiling chose to ignore this paragraph which contradicts its allegations, even though it submitted the memorandum as Exhibit G to its Complaint.

Of all the extensive testimonial evidence presented in this case, only one discussion relates to the alleged nationwide scheme to terminate existing Peugeot dealers and replace them with Chrysler dealers. Joe Thesing, a former Peugeot central zone manager, was asked at his deposition by plaintiff's counsel if five Peugeot franchises could survive in the Denver area. After stating several times that he did not know since he was not currently familiar with the Denver market, Thesing surmised that five dealers would be too many. At the time, there were three Peugeot dealers in Denver. Dreiling asserts that Peugeot sought to award two franchises to Chrysler dealers in Denver, necessitating the termination of one or more existing dealers. Dreiling relies on a list of Chrysler dealers being considered by Peugeot for franchises. The list includes two Denver Chrysler dealers with the notation "A part of our early 1981 plan for Greater Denver." Nothing in this list or any other document suggests, however, that Peugeot intended to award two additional franchises in the Denver area or that it actually had decided to award a franchise to either of these dealers. Indeed, I take judicial notice of the fact that there are currently only two Peugeot dealers listed in the October 1983 Mountain Bell Metro Denver telephone directory, and neither is a Chrysler dealer. Once again, Dreiling relies upon inferences or conclusions it draws from the facts, and not the facts themselves.

As stated above, summary judgment on antitrust claims must be approached cautiously; but summary judgment should not be denied where nothing in the evidence Dreiling has produced supports its theory of the case. In contrast, Peugeot has produced evidence which disproves Dreiling's claim. In his affidavit dated October 1, 1982, Anthony J. Aldarelli averred as follows:

"1. That I am the General Manager, Sales and Marketing, for Peugeot Motors of America, Inc.;

2. That, since July, 1980 a total of 145 new dealerships, including replacement dealers as well as net additions, were added to the Peugeot distribution network in the United States;

3. That of these 145 new Peugeot dealers, only 10 were added as a result of referrals from the Chrysler Corporation; and

4. That of those 10 Chrysler referrals, two have since terminated as Peugeot dealers."

Ten Chrysler referrals out of 145 new Peugeot dealers represents no systematic substitution of existing Peugeot dealers with Chrysler dealers. Ten out of 145, or 7%, may actually be less than the percentage of all car dealers which are Chrysler dealers, given that Chrysler in 1982 sold 10% of the cars sold in America. Thus, one would expect by mere chance to have at least ten Chrysler dealers franchised as Peugeot dealers.

When the layers of innuendo and allegation are cleared away, the *facts* show that the commercial cooperation agreement between Chrysler and Peugeot was not intended to launch, and has not in fact resulted in, the alleged campaign to put existing Peugeot dealers out of business in order to protect newly franchised Chrysler-Peugeot dealers from competition.

Section 1 of the Sherman Act prohibits agreements with the *purpose* or *effect* of restraining competition unreasonably. The unrebutted Aldarelli affidavit clearly establishes that the Peugeot-Chrysler agreement has had no significant *effect* on the distribution of automobiles in the United States. Should summary judgment be defeated,

however, because Peugeot and Chrysler may have *intended* to restrain trade though their plan was ineffectual? Dreiling could argue that its proposed additional discovery of high-ranking Peugeot and Chrysler representatives would reveal such an intent. But the possibility of such a revelation is so remote that it cannot defeat this grant of summary judgment in favor of the defendants. The overt agreement between the defendants is contained in the February 5, 1980 Memorandum of Intent and the May 30, 1980 Agreement. Neither these documents nor the letters, memoranda and testimony Dreiling relies upon can reasonably be construed to support the plaintiff's theory of the case. More significantly, the best evidence of a hidden agreement four years after the alleged agreement was made is the effectuation of that agreement; we are not dealing here with a conspiracy which has not yet had time to take effect. The expected effect from the hidden agreement alleged by Dreiling has not occurred. Accordingly, justice would not be served by permitting this lawsuit to go forward in the search for an anticompetitive *purpose* when there clearly has been no anticompetitive effect.

For all these reasons, I conclude that summary judgment should be granted in favor of the defendants Peugeot and Chrysler on Dreiling's claim under section 1 of the Sherman Act.

4. *Agreement to Monopolize under Section 2 of the Sherman Act and Unlawful Acquisition under Section 7 of the Clayton Act.*

Dreiling alleges in its second claim for relief that Chrysler's 1978 acquisition of fifteen percent of Peugeot, S.A. stock violated section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits acquisitions that may substantially lessen competition or tend to create a monopoly in any line of commerce in any section of the country. The Supreme Court has equated "any line of commerce" under section 7 of the Clayton Act with the relevant product market under section 2 of the Sherman Act. *United States v. Grinnell Corp.,* 384 U.S. 563,

573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966). Thus, proof of the relevant product market and the defendants' power in that market are also material elements of a claim for relief under section 7 of the Clayton Act.

Plaintiff has defined the relevant product market for this claim as the sale of EIRs in Colorado and the United States. Complaint para. 53. Dreiling has submitted absolutely no evidence showing that Chrysler competes with Peugeot in the EIR market. In contrast, Peugeot and Chrysler aver, in the preamble to the May 30, 1980 Agreement, that they do not compete in the EIR market. Similarly, Dreiling has submitted no evidence of Peugeot's power in that market. Plaintiff's failure to submit any probative evidence on these issues makes summary judgment appropriate on this claim for relief.

In its second claim for relief, Dreiling also alleges that the defendants, through the acquisition and agreements, created a monopoly or at least agreed to create a monopoly in the EIR market in Colorado and the United States in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

A combination to monopolize claim has four material elements: (1) a combination or conspiracy; (2) overt acts done in furtherance of the combination or conspiracy; (3) an appreciable effect upon commerce; (4) specific intent to monopolize. *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 438 (10th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). Plaintiff here has failed to show an effect upon an appreciable amount of commerce. There has been no systematic replacement of existing Peugeot dealers with Chrysler-Peugeot dealers, as asserted. Even if Dreiling could prove that its termination was caused by the Chrysler-Peugeot agreement, I conclude that one dealer termination does not constitute an effect upon an appreciable amount of commerce. Summary judgment, therefore, is appropriate on this claim.

Though not, of course, dispositive of these claims, it should be noted that neither

the Federal Trade Commission nor the Justice Department, the federal agencies charged with enforcing the antitrust laws, objected to the stock acquisition. Furthermore, the May 30, 1980 Agreement between Chrysler and Peugeot was executed only after approval by the Chrysler Loan Guaranty Board pursuant to the Chrysler Corporation Loan Guarantee Act of 1979, 15 U.S.C. §§ 1861 *et seq.*

Plaintiff's first claim under section 1 of the Sherman Act and second claim under section 2 of the Sherman Act and section 7 of the Clayton Act are asserted against defendants Peugeot, S.A. ("PSA") and Automobiles Peugeot ("AP") as well as Peugeot Motors of America ("PMA") and Chrysler Corporation. PSA and AP did not move for summary judgment because they had moved to dismiss the claims against them for lack of personal jurisdiction. I need not decide those motions to dismiss since this order for summary judgment decides the claims asserted against PSA and AP as well as those against PMA and Chrysler. Accordingly, summary judgment will be granted in favor of PSA and AP on these claims even though they did not join in the motion for summary judgment.

### 5. *Breach of Contract.*

Dreiling claims that Peugeot Motors of America breached the August 29, 1978 Peugeot Dealer Agreement by terminating the Agreement even though Dreiling had performed all its obligations. Peugeot based its termination on Dreiling's submission of fraudulent warranty claims. Section 25 C.1.f of the Agreement provides:

"Distributor may terminate this Agreement ... in the event that:

\*   \*   \*   \*   \*   \*

Dealer submits any materially false or fraudulent claim or statement relating to predelivery service, warranty repairs, recall campaign repairs, or to any discount, allowance, refund, payment, credit or incentive program or otherwise submits any materially false or fraudulent financial statements, reports or other documents in connection with the carrying

out of its obligations pursuant to this Agreement."

Dreiling admits that its service manager, Lou Bartlett, submitted fraudulent warranty claims to Peugeot but denies that its president, Lloyd J. Dreiling, or its secretary-treasurer, Steven J. Dreiling, had knowledge of or participated in the fraud. Peugeot asserts that Lloyd and Steven Dreiling did participate in the fraud, but even if they did not, that the dealer is still liable for its employee's conduct.

The issue of whether the service manager's fraud can be imputed to the dealership has been extensively and repeatedly argued to this court in prior proceedings. Orders in this case have been based on the implicit ruling that Dreiling was liable for its employee's conduct. Dreiling has now moved for summary judgment on this issue. While I have already ruled on this issue, I will here explicitly set forth my findings and conclusions.

Dreiling first asserts that under the Dealer Agreement, termination would only have been proper if Lloyd or Steven Dreiling personally submitted fraudulent warranty claims to Peugeot. Plaintiff argues that section 25 C.1.f of the Agreement states that Peugeot may only terminate the Agreement if the *dealer* submits any fraudulent warranty claims and that "dealer" is limited to Lloyd and Steven Dreiling because they are the only persons listed in the Agreement (p. 3) with authority to contract with Peugeot on behalf of the L.J. Dreiling Company. Upon review of the Dealer Agreement, I find and conclude that Dreiling reads it too narrowly. Although Lloyd and Steven Dreiling may be the only persons authorized to execute the Dealer Agreement and amendments thereto, they are not the only persons authorized to act on behalf of the dealership in other respects. Nothing in the Dealer agreement precludes the obvious construction that "dealer" must be interpreted according to established agency principles.

The applicable principle of agency law is articulated at section 261 of the Restate-

ment (Second) of Agency. That section states:

> "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."

It cannot be disputed that Dreiling, by employing Bartlett as service manager, put him in a position where he could submit fraudulent warranty claims while apparently acting within his own authority.

Dreiling argues correctly that section 261 presumes an innocent third party and is inapplicable where a third party had actual notice and knowledge of an agent's wrongful conduct. There is a factual dispute as to when Peugeot gained knowledge of Bartlett's fraudulent submissions. Plaintiff alleges that in September 1980, Joseph DiStefano, a Dreiling employee, told William McMullin, the Peugeot central zone service representative, that some "funny business" was going on in Bartlett's submission of Peugeot warranty claims. Dreiling argues that Peugeot had actual knowledge of Bartlett's fraud as of September 1980 and that his conduct after that time cannot be imputed to the dealership. Dreiling also makes much of the fact that Peugeot did not terminate the dealership on the basis of the fraud until May 1981. Moreover, Dreiling asserts that Peugeot is somehow barred from imputing Bartlett's conduct to the dealership because of that time gap.

Assuming that DiStefano did inform McMullin of "funny business" in September 1980 and that this information constituted notice to Peugeot, I fail to understand how Peugeot's delay in terminating Dreiling demonstrates nefarious intent or conduct. A Peugeot service representative, Mark Patterson, informed Dreiling, after a visit to the dealership in February 1981, that he had found irregularities in Dreiling's warranty submissions. Peugeot representatives Donald Palma and Kenneth Worley conducted an audit of Dreiling's warranty files in March 1981. Dreiling has advanced no contractual, statutory or common law duty requiring Peugeot to act more quickly than it did.[9]

I will assume, solely for purposes of these summary judgment motions, that Peugeot had knowledge of Bartlett's fraud as of September 1980 and that consequently Dreiling is not vicariously liable for Bartlett's conduct after that time. However, in order for DiStefano to have reported fraudulent submissions to McMullin in September 1980, fraudulent claims must have been submitted before that time. Under section 261 of the Restatement, this fraud is imputed to the dealership. Peugeot properly terminated Dreiling on the basis of this fraud.[10] Section 25 C.1.f of the Dealer Agreement states that Peugeot may terminate the dealer if the dealer submits *any* materially false or fraudulent claim or statement relating to ... warranty repairs...."

PMA is entitled to summary judgment on this claim.

### 6. *Tortious Interference with Contract by Defendant Chrysler.*

■ This claim against defendant Chrysler is based upon Chrysler's and Peugeot's alleged agreement systematically to replace existing Peugeot dealers with Chrysler-Peugeot dealers, the same theory underlying Dreiling's antitrust claims. As discussed above in relation to the antitrust claims, Dreiling has produced no facts, as opposed to inferences and allegations, to support its theory of the case, while Peugeot has produced the Aldarelli affidavit refuting the plaintiff's theory. The voluminous documentary and testimonial evidence presented indisputably shows that Chrysler agreed to assist Peugeot to improve and expand its dealer network in the United States and that steps were taken toward

9. Dreiling was notified of warranty irregularities in February 1981, yet as of the preliminary injunction hearing on June 26, 1981, Dreiling had not conducted an audit of its own records.

10. *See* November 1, 1982 Memorandum Opinion and Order granting summary judgment in favor of Peugeot on the Automobile Dealer's Day in Court claim.

that goal, but nothing presented to this court can fairly be interpreted as support for plaintiff's theory of systematic termination and replacement.

Dreiling complains that it has been hampered in presentation of its case because discovery was stayed before it could depose executives at the national level of Chrysler Corporation. While I am duly mindful that summary judgment may not be used to resolve prematurely issues warranting a full factual hearing, I do not believe that I am compelled to delay resolution of this matter given the extensive discovery completed to date and the inescapable fact that the alleged purpose of the agreement has not in fact occurred after all this time.

Because Dreiling has failed to produce any significant evidence linking Chrysler's agreement with Peugeot to Dreiling's termination, summary judgment on this claim must be granted in favor of Chrysler.

Accordingly,

IT IS ORDERED that summary judgment is granted for defendants Peugeot Motors of America, Inc., Peugeot, S.A., Automobiles Peugeot, and Chrysler Corporation on all claims and against the plaintiff.

IT IS FURTHER ORDERED that costs be assessed against the plaintiff and in favor of the defendants.

IT IS FURTHER ORDERED that any defendant intending to assert a motion for attorneys' fees shall file an updated motion within twenty days of the date of this order. Motions for attorneys' fees previously filed but not yet ruled upon are outdated and will not be considered.